**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | |
| **v.** | :: | **CRIMINAL ACTION NO.** |
| | :: | **1:14-CR-302-TWT-AJB** |
| **LAVUNTE COLLINS,** | :: | |
| | :: | |
| **Defendant** | :: | |

**UNITED STATES MAGISTRATE JUDGE'S
<u>FINAL REPORT AND RECOMMENDATION</u>**

Defendant Lavunte Collins is charged in a ten-count indictment with committing five armed robberies and using a firearm in relation thereto, in violation of 18 U.S.C. §§ 1951 and 924(c). He moves to suppress evidence seized from a hotel room and his person, [Doc. 18], and his residence in Stone Mountain, Georgia, [Doc. 19], as well as out-of-court photographic identifications. [Doc. 20]. He also moves to dismiss Counts 2, 4, 6, 8, and 10 of the indictment. [Doc. 36]. The Court conducted an evidentiary hearing as to the hotel search and the identifications, [Doc. 26 (hereinafter "T_")], after which the parties filed briefs. [Docs. 29-31, 39-41]. For the following reasons, the undersigned **RECOMMENDS** that the District Judge **DENY** the motion to suppress as to Defendant's person and the hotel room, [Doc. 18]; **GRANT IN PART AND DENY IN PART** the motion to suppress as to his residence,

[Doc. 19]; **DENY** the motion as to the identifications, [Doc. 20]; and **DENY** the motion to dismiss, [Doc. 36].

## I.      Hotel-Room Search

### A.      Facts

Gwinnett County Police Officers McDonald and Jefferson were on routine patrol on Oakbrook Parkway on May 21, 2013, between 8:30 and 9:00 p.m.  T9-10.  One of the locations the officers commonly checked (approximately three times per week) was the Rite4us Hotel, due to the high volume of calls to police and reports of drugs at the location, and the need to maintain a police presence in the area.  T10, 21.  Upon arrival, the officers, who were dressed in uniform with their weapons secured but visible in their holsters, stopped by the front desk and were told by the attendant that there were no reports of suspicious activities or problems.  T11, 14.  The officers advised that they would do a "walk-through" of the hotel.  *Id.*

The officers went to the top floor—the third—and upon the elevator door opening, they smelled marijuana.  T11.  McDonald had smelled marijuana during other patrols at this hotel, and that always led to the discovery of marijuana.  T22-23, 25.  The officers tried to pinpoint where the smell was coming from by sniffing the corners of the doors as they walked by the various rooms.  T12-13, 25.  Using this technique,

2

the officers isolated the smell as coming from the third door they approached, the door to room 323.  They knocked on the door.  T13, 22.

Defendant Collins answered the door less than thirty seconds after the officers knocked.  T13, 26.  He was dressed.  T41-42, 48.  He held the door open while conversing with the officers, and the officers could see part of his body.  T27, 30. When the door was opened, McDonald smelled an "[o]verwhelmingly strong odor of marijuana coming out."  T45.  The officers stated to Collins that they smelled marijuana, and Collins stated that he had smoked a "blunt" earlier in the evening. T13, 28, 42.[1]  Collins invited the officers in to search the room.  T13, 42-43, 49 ("You are free to search the room.").  He stated that he was the only occupant of the room. T44.  Once inside the room, Collins was asked and denied that there were any firearms in the room.  T17.  McDonald patted him down after telling him he was going to do so. T17, 31.  Collins was cooperative.  T17.  The officers did not raise their voices at any time during the encounter.  T19.  The room was small.  T18.  Collins stated who he was

_____

[1]     A "blunt" is a slang term for a cigar hollowed out and filled with marijuana, so that it can be smoked in public (somewhat) inconspicuously.  Urban Dictionary,  http://www.urbandictionary.com/define.php?term=blunt  (last  visited 1/7/16).

and gave his identification to the officers, although McDonald did not recall from where Collins retrieved his identification.  T14, 31, 43.

McDonald asked Collins if they could search the room and he stated that they could.  T14-15, 45.  The officers did not have a written consent-to-search form, nor did they record Collins's consent aurally or in writing.  T29-30.  As McDonald spoke to Collins, Jefferson began searching the room.  T15.  Collins was leaning up against the dresser.  T46.  Collins stated that he flushed his marijuana down the toilet, but Jefferson reported that there was no residue floating in the bowl, as he would have expected if marijuana had been recently flushed.  Collins then stated that he wanted to be honest and admitted that he hid the marijuana under the plastic bag in the trash can, and then he retrieved it and displayed it to the officers.  T15, 46, 50.  There were four grams of marijuana.  T37.  The trash can was immediately to the left of the dresser where Collins was leaning.  T37.  Ten minutes had elapsed since the officers had entered the room. T35.

In the interim, once McDonald learned Collins's name and saw his identification, he radioed Collins's name and his birth date to dispatch, and received a response that Collins had outstanding warrants from DeKalb County for robbery and failure to

AO 72A
(Rev.8/8
2)

appear.  T15.[2]  McDonald retained Collins's identification.  T49.  The warrants then were confirmed several minutes later.  T16.  Jefferson handcuffed Collins and sat him on either the bed or a couch.  T16.  McDonald proceeded to continue searching the room, and located and searched a duffel bag that was on the bed.  T16, 38.  The search revealed that the duffel bag contained a firearm and ammunition.  T16.[3]  When the firearm was located, Collins was seated approximately ten feet from the duffel bag.  T40.  McDonald asked Collins about the firearm, and Collins stated that he forgot about it, but that it belonged to his friend, whom he did not want to identify.  T18.

At Collins's request, before taking him to their police vehicle, the officers permitted Collins to leave his wallet and belongings in the room because the room was registered to his mother.  T19.  The officers were in the hotel room for about forty-five minutes.  T18.  When they left, they took Collins, the clothes he was wearing (a belt, earring, jeans, and a hooded sweatshirt), the firearm and ammunition, and the marijuana, and left everything else.  T48.  McDonald stated that they took the firearm for safekeeping, since there was "no one to be there with it."  T48.

---

[2]    McDonald testified that locating the marijuana and hearing about the outstanding warrants from dispatch occurred almost simultaneously.  T37, 47.

[3]    McDonald could not recall whether the duffel bag was zipped or unzipped. T48.

5

**B.      Arguments of the Parties**

Collins argues that McDonald's testimony that the officers were invited into the room by him to search it was not credible.  [*Id.* at 12].  He argues that it defies human nature for a person who had smoked marijuana—a crime under Georgia law—to invite law enforcement into a hotel room to search and certainly find more marijuana.  [*Id.*].  He also argues that the encounter was not as consensual as depicted by the officer because McDonald could not recall whether he stuck his foot in the door once Collins opened it.  [*Id.* at 13].  He also contends that McDonald's testimony—that no one ever denied them entry into their hotel room and that if the officers smelled marijuana, they always located it in searching the hotel room—likewise was incredible.  [*Id.* at 13-14].

Collins then argues that the firearm and ammunition should be suppressed because probable cause for their seizure was lacking, since the officers had no reason to believe that Collins was a convicted felon, and they had no information about whether the firearm was a fruit, instrumentality, or evidence of a crime, including the crimes for which warrants had been issued.  [*Id.* at 14].  He also argues that even if probable cause existed, there were no exigent circumstances that excused getting a search warrant.  Specifically, Collins argues that none of the traditional grounds for the existence of an exigency—danger of flight or escape, loss or destruction of evidence,

6

risk of harm to the public or police, or hot pursuit—existed in this case. [*Id.* at 16].  He particularly focuses on the lack of harm to the police, since at the time of the seizure of the firearm, Collins was in custody and had been completely cooperative with the officers.  Instead, he argues, there was no danger inherent in leaving the gun in the locked hotel room since the police had no reason to believe that Collins's mother, to whom the room was registered, would not come to get it, since the officers had allowed him to keep his wallet and other belongings in the room for her to retrieve. [*Id.* at 16-18].

The government responds that the officers entered and searched the hotel room, including the duffel bag, resulting in the seizure of the firearm and ammunition, pursuant to lawful consent. [Doc. 30 at 21].  It argues that aside from the officers being in their uniforms, there is no evidence of coercion, and that Collins merely acquiesced to lawful authority.  [*Id.* at 22].  It also argues that the Court should reject Collins's attacks on McDonald's credibility since he testified without contradiction that Collins consented.  [*Id.*].  The government then contends that Collins's voluntary consent to search the room for marijuana extended to the search of the duffel bag, which resulted in the discovery of the firearm and the ammunition.  [*Id.* at 22-23].

7

The government next argues that the firearm and ammunition were lawfully seized under the exigent-circumstances exception to the warrant requirement. [*Id.* at 23 (citing *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007)]. It also relies upon *United States v. Bushay*, 859 F. Supp. 2d 1335, 1370-71 (N.D. Ga. 2012) (Batten, J., *adopting* Baverman, M.J.), where the court found that it was reasonable to seize a firearm in a hotel room where, following the defendants' arrest, there was no one present to claim the firearm or provide for its safekeeping. It further argues that, like *Newsome*, it was reasonable to seize the firearm where the hotel room was registered to a third person (here, Collins's mother), and that it would have been unreasonable for the officers to leave the firearm in an unattended hotel room. [*Id.* at 24-25].

The government also argues that the officers had probable cause to believe that the firearm was connected to a crime, and thus seize it, following Collins's initial denial that firearms were present in the hotel room, his arrest on a warrant for robbery, and his evasive remarks that he had forgotten about the gun and that it belonged to a friend who he refused to identify. [*Id.* at 24].

In reply, Collins again contends that McDonald's testimony was not credible, noting that the officer stated that he found marijuana every time he smelled its odor

8

emanating from a hotel room, pointing to his inability to recall details unless they were contained in his written report, and then arguing that just because there is no contrary evidence, the Court is not relieved from making a credibility determination. [Doc. 31 at 1-2].

He also challenges the government's argument that probable cause existed to support the seizure of the firearm.  He argues that there is no evidence that Collins denied the existence of firearms in the room, and his statement that he had forgotten about the gun and that it belonged to an unidentified friend was neither evasive nor shown to be false.  [*Id.* at 4].  He also submits that there was no evidence that the firearm was connected to any crime, including the robbery for which there was an outstanding warrant.  [*Id.* at 4-5].

Collins also disputes the existence of exigent circumstances, since there was no risk of loss or destruction of the evidence (since the firearm was not linked to any crime), and there was no evidence that the firearm by itself was a danger to the public or the officers.  He distinguishes *Newsome* on the grounds that there, the weapon was linked to a particular crime (a shooting), [*id.* at 5-6 (quoting *Newsome*, 475 F.3d at 1226-27)], and, unlike here, the officers were not sure that the premises were vacant, [*id.* at 6].  He also argues that *Bushay* is not binding, that this Court's

9

discussion of exigency in that case was *dicta* because the hotel room occupants did not have standing, [*id.* (citing *Bushay*, 859 F. Supp. 2d at 1353)], and in that case, there was probable cause to believe the firearm was evidence of a crime.  [*Id.* at 6-7].  He contends that, instead, the Court should follow *United States v. Satterfield*, 743 F.3d 827 (11ᵗʰ Cir. 1984), where the Eleventh Circuit found that the police's re-entry of the residence to seize a shotgun after the occupants were arrested and removed from the scene, presumably to secure it because not all of the suspects had been apprehended and someone could have returned to the location, was not an exigency, where there was another officer left to guard the residence and the police had time to secure a warrant.  [*Id.* at 8 (quoting *Satterfield*, 743 F.2d at 843, 845)].  He argues that the government actually is advocating a "gun exception" to the Fourth Amendment, and contends that there is no right of law enforcement to safekeep firearms in the absence of probable cause or a recognized warrant exception.  [*Id.* at 9].  Finally, he argues that even if the officers could temporarily seize the firearm for officer safety, such a valid purpose did not extend to later testing the firearm for ballistics.  [*Id.* at 9-10].

The Court directed the parties to file a supplemental brief as to whether the search of the duffel bag was justified as a search incident to a lawful arrest.  (Dkt. Entry

AO 72A
(Rev.8/8
2)

9/08/2015).  Not surprisingly, the government argues that the search was supported by the search-incident-to-arrest exception and that police may search the person and the area from which he might gain access to a weapon at the time of arrest, even if the defendant is restrained.  [Doc. 39 at 2-3 (citation omitted)].  It also argues that, as McDonald testified, after the existence of the warrants against Collins was confirmed, McDonald continued searching the room pursuant to consent, and the duffel bag, which was ten feet away from Collins, was the only area that had not already been searched.  [*Id.* at 3 (citing T16)].  The government also cited cases where a search incident to arrest was justified even though the suspect already was in handcuffs.  [*Id.* (citing *Chimel v. California*, 395 U.S. 752, 763 (1969) (where the Court noted that like the search of an arrestee's person, a "gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested," and thus there was "ample justification . . . for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence"); *United States v. Jones*, 218 Fed. Appx. 916, 918-19 (11th Cir. Feb. 27, 2007) (where the court concluded that the search of a bag on which Jones was laying when he was arrested was lawful even though he was handcuffed,

11

since he was still in the hotel room when the officers secured the bag); *United States v. Roper*, 681 F.2d 1354, 1357 (11th Cir. 1982) (approving seizure of handgun in unlocked metal brief case on top of dresser after defendant, who was arrested in hallway, was escorted back into hotel room); *United States v. Savage*, 564 F.2d 728, 733 (5th Cir. 1977)[4] (concluding that seventy counterfeit twenty-dollar bills found in the pocket of a long-sleeved shirt on a motel-room closet shelf, was valid as a search incident to a lawful arrest)].  It noted that the relatively small space of a hotel or motel room satisfied *Chimel*'s spatial parameters in *Roper* and *Savage*, even though the distance between the arrested defendant and the area to be searched was not discussed in those cases.  [*Id.* at 4].  The government also argues that the motel room in this case was relatively small, just as in *United States v. Diaz*, No. 1:09-cr-037-WBH-AJB, 2010 WL 56677193, at *10 (N.D. Ga. Dec. 30, 2010) (R&R), *adopted* 2011 WL 344093 (N.D. Ga. Jan. 31, 2011), where the Court found that searching a hotel nightstand after the defendant's arrest was within the incident-to-arrest exception, [Doc. 39 at 4].  The government further points out that the temporal

---

[4]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

12

requirement of an incident-to-arrest search was satisfied here because the duffel bag was searched only a few minutes after Collins was handcuffed.  [*Id.* at 5].

Next, the government argues that the search was justified due to officer safety.  [*Id.* (citing *United States v. Bennett*, 555 F.3d 962, 967 (11th Cir. 2009))].  It finally contends that the inevitable-discovery doctrine also supported the search of the duffel bag, because the bag would have been searched before it was left unattended in the room, or if it had been brought with Collins to the jail, it would have been searched there.  [*Id.* at 5-6].

In his supplemental brief, Collins first argues that the search-incident-to-lawful-arrest exception is inapplicable because the arrest was tainted initially by his involuntary consent.  [Doc. 40 at 1-2].  He additionally argues that there are only two justifications for a search incident to arrest—to prevent the arrestee from accessing a weapon or destroying evidence—and that the Supreme Court in *Arizona v. Gant*, 556 U.S. 332 (2009), reemphasized that a *Chimel* search incident to arrest is limited to those two purposes.  [Doc. 40 at 3-4].  He also quotes a commentator who contends that the "possibility of access" limitation discussed in *Gant* should extend to any search incident to arrest.  [*Id.* at 4-5 (quoting LaFave, 3 Search & Seizure § 5.5(a) (5th ed.))].  Thus, Collins argues that courts must carefully examine the facts of each case to

AO 72A
(Rev.8/8
2)

determine whether it was realistically possible for an arrestee to reach into the area that the police search. [Doc. 40 at 5]. He argues that since he was handcuffed (in the back) and seated on the couch, he could not have accessed the weapon in the bag, which was the only possible rationale for the search since the arresting officers had no information as to the circumstances of the offense charged in the outstanding warrant. [*Id.*]. He argues that *United States v. Jones*, 475 F.2d 723 (5ᵗʰ Cir. 1973), supports his argument because in that case, the court stated that "if defendant's hands were cuffed behind him in such a manner that he was denied access to the suitcase, then the search could not be upheld under *Chimel* because the suitcase would not be within his immediate control or within an area from which he might gain possession of a weapon or destructible evidence." [Doc. 40 at 6 (quoting *Jones*, 475 F.2d at 727-28)]. He thus argues that the government has failed to demonstrate that he had a "possibility of access" to the duffel bag. [*Id.* at 6-7]. He also repeats his argument that the police had no reason to seize the weapon since they lacked probable cause to believe it was contraband or evidence of a crime, [*id.* at 7], and similarly denies that the weapon was properly subject to seizure for officer safety and safekeeping. [*Id.*].

In his response to the government's supplemental brief, Collins argues that the search of the duffel bag did not satisfy *Chimel*, since he was handcuffed and ten feet

14

away from the duffel bag, which is outside of his "grab area." [Doc. 41 at 1-2]. He submits that none of the cases relied upon by the government was decided after *Gant* and thus should not be relied upon. [*Id.* at 2-3]. He also argues that the government argued for the first time that the weapon would have been inevitably discovered, and therefore the government waived the argument by not raising it initially. [*Id.* at 3]. He additionally argues that inevitable discovery is factually unsupported in this case because the officers did not search the other items that Collins asked to have left behind for his mother, such as his wallet, and that the bag would have been searched at the jail is pure supposition. [*Id.* at 3-4]. He also contends that the firearm was not properly seized for safekeeping, but instead should have been kept there for his mother, who had rented the hotel room. [*Id.* at 6].

In the government's response to Collins's supplemental filing, it argues that it proved that Collins's consent was voluntary. [Doc. 42 at 1-2]. It also argues that other courts have applied the search-incident-to-arrest exception even where the defendant was handcuffed, and even after *Gant* was decided. [*Id.* at 2 (citing *Bennett*, 555 F.3d 962 (where the search under a mattress was upheld even though the subjects were handcuffed on floor with hands behind them), and *United States v. Dunton*, No. 1:13-CR-00230-ODE-JFK-1, Doc. 88 at 20-21 (N.D. Ga. July 2, 2015) (upholding

15

search of couch incident to arrest even though the couch was approximately five feet from the defendant, who was handcuffed to the back on the floor, and the scene was secured by about six law-enforcement officers)].

The government also takes issue with Collins's argument that the voluntariness of his consent is the threshold issue, arguing that because no matter how the officers came to learn Collins's identity, his identity is not subject to suppression, he therefore would have been arrested on the outstanding warrants, and the officers would have been entitled to conduct a search incident to arrest.  [*Id.* at 3 (citing *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1186 (11ᵗʰ Cir. 2009)].

The government next argues that the search of the motel room and duffel bag was supported by probable cause and exigent circumstances, in that the smell of marijuana gave probable cause to believe that Collins was committing a drug crime and he admitted that he flushed marijuana down the toilet.  Thus, the government argues, the danger of the destruction of evidence was not a mere hypothetical.  [*Id.* at 4].

## C.    *Discussion*

### 1.    *Consent to Search the Hotel Room*

First, the Court concludes that Collins voluntarily consented to a search of the hotel room.  The Fourth Amendment prohibits unreasonable searches and seizures, and

AO 72A
(Rev.8/8
2)

in the absence of a warrant, a search is only reasonable if it falls within a specific exception to the warrant requirement. *United States v. Watkins*, 760 F.3d 1271, 1278 (11th Cir. 2014). A warrantless search preceded by valid consent is one such exception. *Id.* at 1279. Whether consent is "voluntary" is a factual determination to be made based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc); *see also United States v. Nuyens*, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). The government bears the burden of proving that consent was voluntarily and freely given and was not the product of coercion or mere submission to police authority. *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).

In determining whether consent was voluntary in a specific case, the Eleventh Circuit has identified a non-exhaustive list of relevant factors, including the following:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*Id.* (quoting others sources). The government has the burden of showing, by a preponderance of the evidence, both that there was consent to search and that the

17

AO 72A
(Rev.8/8
2)

consent was voluntary.  *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004).

Although the preponderance standard is not as difficult to meet as the reasonable-doubt

or clear-and-convincing standards, it "is not toothless," and the government must meet

its burden with "reliable and specific evidence."  *United States v. Cusick*,

559 Fed. Appx. 790, 792 (11th Cir. Feb. 24, 2014) (quoting *United States v. Lawrence*,

47 F.3d 1559, 1566 (11th Cir. 1995)).

 As the Eleventh Circuit has recognized, the issue of consent often turns on

credibility determinations made by the district court.  In general, the appellate court

affords considerable deference to the district court's credibility determinations because

the court "personally observes the testimony and is thus in a better position than a

reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*,

289 F.3d 744, 749 (11th Cir. 2002).  Where opposing parties present directly conflicting

accounts, the district court's choice of whom to believe is typically conclusive unless

the court credits testimony that, because it is exceedingly improbable or contrary to the

laws of nature, no reasonable factfinder could accept as true. *Id.*

 Initially, the undersigned finds that Officer McDonald's testimony was credible.

His testimony was not contradicted, and there is simply no evidence in the record to

support a finding that he was not credible.  There is nothing incredible about detecting

AO 72A
(Rev.8/8
2)

marijuana odors through the spaces between the hotel door and the door frame, particularly where that the odor is circulated by a hotel room's air conditioner. T23, 34. Nor is it remarkable that McDonald claimed that he always found marijuana in rooms at the Rite4us Hotel after having detected its smell; it is just as likely that persons who risk smoking marijuana in their hotel rooms would retain more marijuana in their rooms.

Collins argues that it belies human nature for one who possesses controlled substances to voluntarily admit police officers into a location to search where they surely would locate the contraband. However, the issue is not Collins's subjective motivation to consent (as to which the record is silent) but whether the police did or said anything that coerced him into consenting. No doubt there are always forces inducing a person to cooperate with the police, including "the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful . . . ." *See Coolidge v. New Hampshire*, 403 U.S. 443, 487-88 (1971). Here, there may have been multiple incentives motivating Collins to be cooperative. Suffice it to say there is nothing incredible about Collins's cooperation; defendants frequently cooperate in situations that, in 20/20 hindsight, seem unwise or fantastical. Collins may have

19

AO 72A
(Rev.8/8
2)

cooperated out of fear that his resistance would have ultimately led the police to discover that he was involved in a shooting a few hours before (*see infra*), he simply may have let his guard down after smoking marijuana, or he may have initially believed that the police would not have located the small amount of marijuana in the room. Whatever his underlying motivation(s), the record is undisputed that he in fact consented and his consent was voluntary.

When the officers first knocked on the door, Collins answered it within thirty seconds. The officers stated to him that they smelled marijuana, and Collins readily admitted to having smoked marijuana earlier and told the agents they could come in and search the room. Thus, he voluntarily agreed to allow the agents to search for marijuana before even being asked. Then, once the officers were inside the room, he was advised that he was going to be patted down and then frisked. At that point, he was asked whether the officers could search, and he stated that they could. Up to this point, Collins was not in custody and the encounter was consensual. The officers did not raise their voices or otherwise indicate that their requests had to be obeyed. To the extent that the encounter was transformed into anything beyond a consensual one, the officers were authorized to detain Collins based on the smell of marijuana and his confirming admission that he smoked it. *See United States v. White*, 593 F.3d 1199, 1203

(11th Cir. 2010) (noting that "[t]he smell of marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct"); *see also United States v. Hunter*, 373 Fed. Appx. 973, 976 (11th Cir. Apr. 19, 2010) ("The recognizable smell of marijuana is sufficient to establish reasonable suspicion."). Moreover, given that Jefferson was going to search the room while McDonald remained with Collins, the totality of the circumstances authorized McDonald's frisk of Collins. *Cf. United States v. Knight*, 562 F.3d 1314, 1327 (11th Cir. 2009) (concluding that smelling marijuana and alcohol during traffic stop contributed to officer's reasonable belief that suspect posed safety threat, which justified pat-down search).

Further, the record establishes that the officers did not employ coercive procedures. Immediately after Collins answered the door, the officers told him that they smelled marijuana. Once inside the room, McDonald told Collins that he was going to frisk him. Even if McDonald put his foot in the doorway to keep the door from closing, the marijuana smell that he detected (confirmed by Collins's admission) gave him the authority to at least detain Collins. *United States v. Salley*, 341 Fed. Appx. 498, 500 (11th Cir. Aug. 5, 2009) ("This Court has found reasonable suspicion to support further detention based on, among other things, the 'strong odor of marijuana.' ") (quoting *United States v. Griffin*, 109 F.3d 706, 708 (11th Cir. 1997)

21

(noting that odor of marijuana detected during traffic stop furnished reasonable suspicion justifying further detention and investigation of suspect)); *see also Tobin*, 923 F.2d at 1512 (odor of marijuana from house provided probable cause); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) (smell of marijuana coming from package sufficient to create probable cause); *United States v. Arrasmith*, 557 F.2d 1093, 1094 (5th Cir. 1977) (smell of marijuana justified search of vehicle); *United States v. Gorthy*, 550 F.2d 1051, 1052 (5th Cir. 1977) (odor of marijuana emanating from living quarters of motor home constituted probable cause for search).   Moreover, it is significant that after he was arrested, Collins felt comfortable enough with the officers to ask that his clothes and wallet be left for his mother to retrieve, and thus offers further support that the atmosphere surrounding his consent was not coercive.

Next, Collins was completely cooperative with the officers.  He invited them to search.  While Jefferson searched the room initially, Collins leaned up against the dresser and spoke with McDonald.  When there was no marijuana residue found in the toilet, he told the officers that it was hidden under the plastic liner in the trash can and retrieved it for them.  These facts indicate that Collins was cooperative.

As to being advised of his right to refuse consent, it is true that Collins was not so advised, but that fact is counteracted by Collins's unprompted invitation to allow the

officers to enter and search.  Also, the failure to advise a defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search.  *Pineiro*, 389 F.3d at 1366 n.4; *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

Next, the record is silent as to Collins's education and intelligence.  However, there is no argument that Collins did not understand the nature of the request to search being made to him.

The final factor—the defendant's belief that no incriminating evidence will be found—also supports a finding that Collins voluntarily consented.  Collins told the officers initially that he had flushed the marijuana down the toilet, and thus it is reasonable to conclude that, by that statement, he hoped that they would either not find any marijuana or be dissuaded from a further search.  His stated belief that no incriminating evidence would be found is a factor pointing to the validity of his consent.  *United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978) ("Believing he had nothing to hide, he had nothing to gain by refusing to consent to the search.") (citation omitted).  Moreover, if he was being honest when he disclaimed recalling that he had

23

a firearm in his duffel bag, then he would have believed that the officers would not have located the firearm in the bag.[5]

Thus, Collins voluntarily consented to a search of the hotel room.

### 2.    *Seizure of the Firearm and Ammunition*

The question remains whether the officers were justified in seizing the firearm and ammunition. The Court concludes that the officers were justified under the exigency/public safety exception. Initially, however, the Court shows why the officers

---

[5]    To the extent that Collins challenges the scope of his consent, the search of the duffel bag for marijuana was within the scope of the search given, and thus the firearm and ammunition were lawfully observed. A search is impermissible when an officer does not conform to the limitations imposed by the person giving consent. *Zapata*, 180 F.3d at 1242. *See United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990); *see also United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (holding that consensual search is confined to the terms of actual consent given). When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *Strickland*, 902 F.2d at 941; *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness - - what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). To ascertain what conduct is within the "bounds of reasonableness," the Court must consider what the parties knew to be the object (or objects) of the search. See *Jimeno*, 500 U.S. at 251; *Martinez*, 949 F.2d at 1119. However, a general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items. *Martinez*, 949 F.2d at 1120. Here, it was likely that marijuana could have been secreted in the duffel bag.

24

could not seize the firearm under the plain-view, search-incident-to-lawful-arrest, or inevitable-discovery exceptions to the Fourth Amendment's warrant requirement.

### a.    Plain-View Exception

The "plain view" exception to the Fourth Amendment's warrant requirement permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent. *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Hromada*, 49 F.3d 685, 690 n.11 (11th Cir. 1995). "The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located." *United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991). An officer conducting a lawful search may seize items discovered in plain view if probable cause exists to believe the items are evidence of criminal activity. *See Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (reconsidering the "immediately apparent" language in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and substituting a less rigorous probable-cause standard for plain-view seizures). Probable cause to seize an item in plain view exists whenever the facts available to the searching officer support a reasonable belief that the item may be contraband, stolen property, or

evidence of a crime. *Id.* at 742. The plain-view doctrine, however, cannot be used to justify exploratory or investigative searches until "something incriminating at last emerges." *Coolidge*, 403 U.S. at 446.

Probable-cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States*, 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton*, 496 U.S. at 138 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

Similarly, the propriety of seizures under the plain-view doctrine are considered on an objective basis. *See Horton*, *id.* (where the Court rejected argument that "plain view" seizure requires inadvertent discovery, in part because of its preference for

26

"application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"); *cf. Scott v. United States*, 436 U.S. 128, 138 (1978) (stating that "fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

Here, the first prong of the plain view doctrine applies in the government's favor. The officers had lawful access to view and search the duffel bag, because Collins had voluntarily consented to his hotel room being searched for marijuana, and marijuana certainly could have been secreted inside the duffel bag. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (recognizing that permission to search specific area for narcotics may be construed as permission to search any compartment or container within the specified area where narcotics may be found); *United States v. Harris*, 928 F.2d 1113, 1118 (11th Cir. 1991) (same).

On the other hand, the seizure of the firearm and ammunition from the duffel bag is not supported by the second prong of the plain view doctrine, that is, the apparent criminality of the weapon and the ammunition. The officers knew only that Collins possessed a small, user amount of marijuana, and it is not unlawful under Georgia law

27

to possess a firearm while in possession of a misdemeanor amount of marijuana. *See* O.C.G.A. § 16-11-106(b)(4). That Collins also claimed to have flushed some marijuana down the toilet, thus suggesting possession of a greater amount of marijuana, does not objectively allow the officers to infer that Collins possessed a felony amount of marijuana under Georgia law (over one ounce) or that the marijuana was possessed with the intent to distribute it. Additionally, although when law-enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location, *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990) (finding firearms not named in a warrant were properly seized during search of drug house as "tools of the trade"), the small amount of marijuana involved in this case, together with the absence of any other indicia of drug trafficking (such as a large amount of currency or distribution packaging materials), does not reasonably permit such an inference in this case. *Cf. United States v. Rucker*, 588 Fed. Appx. 943, 945-46 (11th Cir. Oct. 21, 2014) (observing that intent to distribute may be inferred from quantity of contraband seized and lack of paraphernalia used to consume the drugs) (citations omitted). The Court recognizes that the Eleventh Circuit has held that intent to distribute may also be inferred from the presence of firearms, which are the " 'tools

28

of the trade' " for drug dealers, *Rucker*, 588 Fed. Appx. at 946 (quoting *United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990)); however in *Rucker*, the police also found a scale with cocaine residue, sandwich baggies, a Pyrex pot containing crack-cocaine residue, and a lack of personal-use paraphernalia, and the defendant admitted to possessing distribution amounts of controlled substances, *id.* The mere presence of the firearm in the present case, even if taken together with Collins's "exculpatory no" as to possessing a firearm, does not give rise to probable cause to seize the firearm.

Moreover, there is no indication in the record that the outstanding robbery warrant from DeKalb County was for armed robbery or that the firearm in the duffel bag was related to or evidence of that offense.[6] Thus, the government's argument that

_____

[6]    The evidence produced at the evidentiary hearing was that Collins was subject to an outstanding warrant for robbery.   T15.   The Court notes that DeKalb County Superior Court's Online Judicial System (OJS) appears to reflect that the warrant actually was for armed robbery. http://www.ojs.dekalbga.org/servlet/page?_pageid=182,285&_dad=portal30&_schema=PORTAL30&dcms.exact_last=ON&dcms.spriden_id=%402979743&dcms.case_type=&dcms.to_date=12%2F31%2F2090&dcms.from_date=01%2F01%2F1900&dcms.last_name=COLLINS&dcms.first_name=LAVUNTE&dcms.case_status=ALL&dcms.cort_code=&dcms.soundex=&dcms.case_id=13CR4933&dcms.ent_code=COURTS&dcms.pstart=0 (last visited Jan. 10, 2016).

Collins's initial denial that he had any weapons, in addition to these other facts, established probable cause to allow the seizure of the weapon, is rejected.

### b. *Search-Incident-to-Lawful-Arrest Exception*

Second, the Court concludes that the firearm was not subject to seizure as incident to Collins's lawful arrest. It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee. *United States v. Robinson*, 414 U.S. 218, 224 (1973).

Under these principles, police may search not only an arrestee's person but "the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763. "Such searches have long been considered valid because of the need 'to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *New York v. Belton*, 453 U.S. 454, 457 (1981) (quoting *Chimel*, 395 U.S. at 763). A

30

AO 72A
(Rev.8/8
2)

custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. *Robinson*, 414 U.S. at 235.

Moreover, whether the police have exclusive control of a seized item does not necessarily determine whether the item remains in "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Chimel*, *id.*; *see United States v. Jones*, 218 Fed. Appx. 916, 919 (11th Cir. Feb. 27, 2007) (upholding search of bag in hotel room incident to arrest even though defendant was handcuffed, and recognizing other courts' similar conclusions) (citing *United States v. Romero*, 452 F.3d 610, 619-20 (6th Cir. 2006) (explaining that search of nightstand was permissible because nightstand would have been within handcuffed defendant's reach had he not been handcuffed), and *United States v. Queen*, 847 F.2d 346, 349, 353-54 (7th Cir. 1988) (permitting search where arrestee was handcuffed behind his back and guarded by two armed officers before search of closet three feet away)); *see also United States v. Hehnstetter*, 56 F.3d 21, 23 (5th Cir. 1995) (seizure of automatic weapon protruding from under chair where defendant was sitting following arrest valid although defendant handcuffed); *United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991) (seizure of gun found between mattress and box spring within defendant's reach valid

31

although defendant handcuffed); *United States v. Lucas*, 898 F.2d 606, 609-10 (8th Cir. 1990) (search of closed kitchen cabinet valid, though out of arrestee's reach, because he reached for cabinet door during scuffle preceding arrest and two of arrestee's friends sat unhandcuffed at nearby table); *Diaz*, 2010 WL 56677193 at *10 (search of nightstand permissible where handcuffed defendant seated on bed next to nightstand). *But see, e.g., Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003) (search of bedroom invalid as incident to arrest because not contemporaneous with, or conducted in vicinity of, arrest where defendant arrested in living room and police searched purse located in bedroom). Other courts of appeal have held that the police may search closed containers in a hotel room incident to arrest of the occupant, even when the occupant has been restrained. *United States v. Perdoma*, 621 F.3d 745, 750-51 (8th Cir. 2010) (holding that defendant's bag was lawfully searched incident to arrest even though he was restrained in bus station, and citing cases); *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987) (permitting search incident to arrest in hotel room to encompass the whole room and closed suitcase).

The Court has not been able to find any cases in this Circuit extending an arrested, handcuffed defendant's grab area out to approximately ten feet. The closest case that the Court located is Judge Vineyard's R&R in *United States v,*

32

*Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1347-48 (N.D. Ga. 2009) (holding that agents properly seized cell phones that were six feet from defendant at time of arrest) (Thrash, J., *adopting* Vineyard, M.J.).  Other courts have held that a distance of ten feet precludes application of the search-incident-to-lawful-arrest exception.  *United States v. Williams*, No. 09-CR-61, 2010 WL 1904982, at *10 (E.D. Wisc. Jan. 28, 2010) (where government conceded that in light of *Gant*, search not justified as incident to arrest because defendant was handcuffed in back approximately ten feet away from the rear of his vehicle); *United States v. James*, No. 1:07CR00057ERW (FRB), 2007 WL 2908886, at *5 (E.D. Mo. Oct. 4, 2007) (concluding that seizure of clothing ten-to-twelve feet from handcuffed defendant was not incident to arrest but upholding seizure on exigency grounds due to fact that defendant was not wearing any clothes). *But see United States v. Nascimento*, 491 F.3d 25, 49, 51 (1st Cir. 2007) (upholding search of closet eight to ten feet away where defendant not handcuffed).

As a result, the Court agrees with Collins that the government did not establish the applicability of the search-incident-to-lawful-arrest exception.  In this case, Collins was in handcuffs secured in the rear.  He was seated on a couch approximately ten feet from the duffel bag that contained the firearm.  Considering *Chimel*'s admonition that "[t]here is no . . . justification . . . for searching through all the desk drawers or other

33

closed or concealed areas in [the immediate area where an arrest occurs,]" and that "[s]uch searches, in the absence of well-recognized exceptions [to the warrant requirement], may be made only under authority of a search warrant," *Chimel*, 395 U.S. at 763; *see also Tobin*, 923 F.2d at 1513 n.7 (holding that looking into cabinets and drawers not justified as search incident to arrest), the Court concludes that the search of the duffel bag cannot be justified as a search incident to Collins's arrest.

### c.      *Inevitable Discovery*

The Court also rejects the government's inevitable-discovery ground because the government raised it only after additional briefs on the search-incident-to-lawful-arrest issue were requested. *Cf. United States v. Britt*, 437 F.3d 1103, 1104 (11th Cir. 2006) (refusing to consider issues not raised in initial brief).

In addition, even if the Court considered the argument, the facts do not support the application of the exception in this case. In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court recognized that evidence obtained by unconstitutional means should not be suppressed "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police . . . ." *Nix*, 467 U.S. at 447; *United States v. Khoury*, 901 F.2d 948, 959-60 (11th Cir. 1990); *see also United States v. Virden*,

34

488 F.3d 1317, 1322 (11th Cir. 2007) (stating that government's burden was to establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means) (citing *Nix*, 467 U.S. at 434).  The mere assertion by law enforcement that the information would have been inevitably discovered is not enough. *Virden*, 488 F.3d at 1322 (citing *United States v. Brookins*, 614 F.2d 1037, 1048 (5th Cir. 1980)).  Instead, the Eleventh Circuit's rule is that in order to establish inevitable discovery the prosecution must show that " 'the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct.' "  *Id.* (quoting *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004)) (emphasis in original); *see also Khoury*, 901 F.2d at 960; *United States v. Drosten*, 819 F.2d 1067, 1070 (11th Cir. 1987); *Satterfield*, 743 F.2d at 847.  "This second requirement is especially important.  Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action."  *Virden*, 488 F.3d at 1322-23 (citing *United States v. Hernandez-Cano*, 808 F.2d 779, 784 (11th Cir. 1987)).

In the present case, there is no evidence that the officers were going to take the duffel bag with them when they arrested Collins, as there is every indication that they

acceded to his request to leave items in the room for his mother to obtain later.  As a result, the inevitable-discovery justification does not save the seizure of the firearm.

### d.     Public-Safety/Exigency Exception

The Court concludes that, as in *Bushay*, it was reasonable for the officers to not allow the weapon to be left unattended in the hotel room, and thus the weapon and ammunition were properly seized.  It is true that in *Bushay*, my reasoning upholding the warrantless seizure of the pistol was *dicta* because the defendant lacked a sufficient privacy interest in the motel room; however, the reasoning in *Bushay* is persuasively instructive in the present case.  In *Bushay*, the defendant was under indictment in Atlanta for drug trafficking.  Title III intercepts revealed he was at a motel in Florida.  After he and a codefendant left the motel, they were arrested at a restaurant.  *Bushay*, 859 F. Supp. 2d at 1356.  When questioned, Bushay stated that he had left a gun in the hotel-room nightstand.  Officers took the plastic room key seized from Bushay and went to the motel, where they detained two other persons in the motel room and seized the firearm.   I evaluated the seizure of the firearm as follows:

> "[R]easonableness is still the ultimate standard" under the Fourth Amendment.  *Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523, 539[ ] (1967).   Viewed objectively, *see Horton v. California*, 496 U.S. 128, 138[ ] (1990) (noting that "evenhanded law enforcement is best achieved by the application of objective standards of

36

conduct, rather than standards that depend upon the subjective state of mind of the officer"), the firearm was properly seized under the exigent-circumstances exception to the warrant requirement.

In *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007), the defendant was suspected of having shot his wife and child. Police traced him to a hotel room registered in another person's name. They surrounded the room, and when Newsome came out, he was arrested. An officer asked him whether there was anyone or anything in the room that he should know about. Newsome told the officer he had a gun, indicating towards the night stand. When the officer did not see the weapon, he asked Newsome where it was, and Newsome directed him to a black bag where the pistol was located. *Id.* at 1222-23. Newsome was charged federally with being a felon-in-possession, and before trial moved to suppress the firearm on Fourth and Fifth Amendment grounds. On appeal from his conviction, the Eleventh Circuit affirmed, rejecting Newsome's Fourth and Fifth Amendment challenges. Relevant to the present case is the *Newsome* [c]ourt's rejection of the Fourth Amendment attack by applying an exigent-circumstances rationale to support the warrantless search:

> [T]he Supreme Court has "long recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context." [*New York v. Quarles*, 467 U.S. 649, 653 n.3[ ] (1984) ]. *Quarles* holds that the warrantless seizure of a gun is "objectively reasonable" under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large. *Id.* (citations omitted); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989).

*Newsome*, 475 F.3d at 1226. The *Newsome* [c]ourt found exigent circumstances warranted the seizure of the firearm because the officers had reason to believe that Newsome was with another person and "[i]t was not unreasonable for the officers to fear leaving a loaded gun, likely

AO 72A
(Rev.8/8
2)

evidence of a crime (the alleged shooting of his wife and child), unattended in a motel room.  Nor was it unlikely that a friend, possibly [the person in whose name the room was registered], would return to the room and remove the gun.  We have held that officers can seize evidence where there is a fear that it might disappear or be destroyed." *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983) [ ] ("The exigent circumstances exception to the fourth amendment warrant requirement applies in 'those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.' " (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759[ ] (1979))).  The exigent circumstances exception to the Fourth Amendment permitted locating and securing the weapon, making the seizure and subsequent admission of the gun proper.  *Newsome*, 475 F.3d at 1226-27.

*Bushay*, 859 F. Supp. 2d at 1369-71.  Additionally instructive is the

following language from *United States v. Lawrence*, No. CRIM. 05-

333(MJD/RLE), 2006 WL 752920 (D. Minn. Mar. 26, 2006):

Exigent circumstances may permit a warrantless search of a home under the "public safety" exception, which permits an officer to search for or seize a dangerous weapon or instrumentality based on the officer's legitimate concern for the safety of the public or themselves.  *United States v. Janis*, 387 F.3d 682 (8th Cir. 2004) (holding that concern for safety of others allowed police to enter residence, where they discovered firearms in plain view); *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (noting that a legitimate concern for safety of law enforcement officers or others constitutes exigent circumstances); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989) (holding that search for firearm was permissible where officers witnessed defendant in possession of firearm and planned to leave children unattended in the home); . . . *Warden v. Hayden*, 387 U.S. 294, 298-99[ ] (1967) ("The Fourth Amendment does not require police officers to delay in the course

38

of an investigation if to do so would gravely endanger their lives or the lives of others.").

*Lawrence*, 2006 WL 752920 at *1.

In the present case, the officers were removing Collins from the scene and transporting him to the Gwinnett County Jail, for ultimate transfer to DeKalb County to respond to the outstanding warrants. Although the motel room apparently was rented in his mother's name, and Collins requested—and the officers agreed—to leave his clothes and wallet in the room for her to retrieve, there is no evidence as to when his mother would retrieve these items, whether she would retrieve the items before or after the rental term for the room expired, or whether she was able or even willing to take possession of the firearm. In fact, most significantly, according to Collins, the firearm belonged to some third person that he refused to name, who presumably was not his mother. T18. Also, there was no evidence that Collins's mother (or any other person) made a request for the firearm, or whether she even retrieved the other items from the hotel room.[7] What is clear is that, as a motel room, the location was accessible during the period of the rental term to at least motel employees. These facts render *Satterfield*

---

[7]     The search warrant application for Collins's mother's home reflects that his mother attempted to get her money back from the room following her son's arrest. [Doc. 23-1 at 4].

distinguishable, since in that case, the defendant was removed from his home and there was no indication that any other person could have gained access to the residence. *Satterfield*, 743 F.2d at 844-45. Here, however, Collins's rental period was limited, and other people, including motel staff, had access to the room. Although a person has Fourth Amendment protections in a motel room just like at his home, *Hoffa v. United States*, 385 U.S. 293, 301 (1966); *United States v. Forker*, 928 F.2d 365, 370 (11th Cir. 1991) (holding that a motel room, however temporary, is equivalent to one's home) (citation omitted); *United States v. Standridge*, 810 F.2d 1034, 1036 (11th Cir. 1987) (stating the Fourth Amendment's warrant requirement "applies to a motel room"), *see also Stoner v. California*, 376 U.S. 483, 487-90 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent to police search of room), the fact that other persons legitimately could access the room created an exigency permitting the officers to remove the firearm. Finally, although not as significant as the other facts, there is no evidence that Collins requested that the firearm specifically be kept in the room along with his clothing and wallet for his mother to retrieve it.

In conclusion, it simply would have been unreasonable for the officers to have left what appeared to be an operable firearm unsecured—perhaps overnight (the

AO 72A
(Rev.8/8
2)

encounter in the room began at approximately 9:00 p.m.)—in a now-vacated motel room, in a motel where there were frequent complaints of crime and drug usage, thereby rendering it susceptible to theft or accidental discharge by a Rite4us employee. Therefore, even in the absence of probable cause that the firearm was contraband or evidence of a crime, based on *Newsome*, *Antwine, Lawrence*, and *Bushay*, the Court concludes that the firearm presented a danger to the public that the officers were authorized to mitigate by seizing the weapon.  Once in lawful possession of it, law enforcement could examine the firearm and its ammunition, and then on May 29, 2013, determine that the firearm potentially was the same firearm that was discharged on May 21, 2013.  *United States v. Edwards*, 415 U.S. 800, 806 (1974) ("Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest."); *see also United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970) ("While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.") (quoted in *Edwards*, 415 U.S. at 808).

41

As a result, the firearm and ammunition from Collins's bag were lawfully seized, and, therefore, the Court **RECOMMENDS** that Collins's motion to suppress the fruits of the search of the hotel room be **DENIED**.

## II.     Residence Search

### A.     Facts

On May 29, 2013, a DeKalb County search warrant was executed at Collins's home, 4439 Cedar Ridge Trail, Stone Mountain, Georgia. [*See* Doc. 23-1].  In support of the warrant, the affiant, DeKalb County Police Department ("DKPD") Detective A.T. Quigley, asserted that DKPD detectives were investigating several armed robberies related to a Craigslist posting, the robberies occurring between March 5 and May 21, 2013.   Quigley related that an attempt to rob Thong Duc Tran on May 16, 2013, occurred at an address on Cedar Ridge Trail in Stone Mountain, and that Tran gave the police a copy of the Craigslist ad for a white iPhone 5 to which he responded.  Tran stated that an unknown black male approached him at the designated meeting point for the sale, took out a black automatic pistol from his backpack, and demanded all of Tran's money.  Tran was able to escape despite the robber grabbing his shirt.  Quigley then related that on May 21, 2013, a shots-fired investigation on Walnut Ridge Way—in the same neighborhood as the attempted robbery on Tran and

42

AO 72A
(Rev.8/8
2)

where Collins's home was located—also was related to a Craigslist ad, and two .40 caliber rounds were recovered at the scene.  The shooter was described as a dark-complected black male wearing Adidas flip-flops and carrying a black book bag.

On May 29, 2013, police received records subpoenaed from Craigslist, and the e-mail address used to post the ad for the white iPhone 5 came back to Collins.  Further investigation revealed that Collins had been arrested in Gwinnett County on May 21 and that he possessed a .40 caliber pistol at the time of his arrest.  Quigley reported that no Craigslist robberies had been reported since May 21.

Quigley also reported that the photograph in the Craigslist ad to which Tran was responding showed the phone being held by a hand with a very distinctive mole on the left thumb, and in examining Collins's thumb, Quigley found that Collins had the exact same mole on his left thumb.  Police spoke with Collins's mother, who confirmed that her son lived with her at the location to be searched.  When speaking with Collins's mother, police noticed that the carpet with a diamond-shaped area rug in Collins's home matched the carpet and rug depicted in the aforementioned Craigslist ad.  [Doc. 23-1 at 3-4].

The warrant authorized the search for and seizure of:

firearm, firearm components, ammunition, ammunition components, any device that could be used in communication with internet access to place a Craigslist ad to include computers, cell phones.  Any clothing worn by the suspect during the armed robbery incidents.  White Iphone 5 which was posted on the original ad.   The area rug with diamond shaped patter[n].  Identification, and identification documents that would indicate other suspect(s) involved.  Any property which was stolen from any of the armed robbery victims.  Any photograph[]s, to include any device that can capture digital images.

[Doc. 23-1 at 1].

### B.      *Arguments of the Parties*

In his post-hearing brief, Collins contends that the Court should suppress items seized pursuant to the search warrant because they were not described with sufficient particularity, specifically a white tank-top shirt, gray shorts, black shorts, Arizona identification in the name of Leroy Smith, black Adidas slippers, and a gray hooded sweatshirt.  [Doc. 29 at 2].[8]  He contends that the authorization in the search warrant to seize " '[a]ny clothing worn by the suspect during the armed robbery incidents' " and " '[i]dentification, and identification documents that would indicate other suspect(s)

_____

[8]      He also argues that the warrant for his home should be invalidated because it was a fruit of the illegal seizure of the firearm.  [Doc. 29 at 18-19].  Since the Court has concluded that the firearm was properly seized, this argument is rejected.  At the evidentiary hearing, Collins withdrew his challenge to the warrant on grounds of probable cause and lack of a signature by the issuing judge, since by the time of the hearing, he had received a complete copy of the warrant application that contained both a showing of probable cause and the issuing judge's signature.  T130-31.

44

involved' " are not specific enough to guide the searching officers as to what they could seize such that it amounted to impermissible blanket authorization. [*Id.* at 3]. He submits that absent application of the good-faith exception, suppression is mandated. [*Id.*].

He also argues that the seizure of two pink bags, iPhone 4S box, iPhone 4 box, gray Athlete's Foot notebook, Xfinity Technicolor modem, miscellaneous papers, and a black mask exceeded the scope of the warrant. [*Id.* at 4-5].

In response to Collins's arguments that the warrant authorized an impermissible general rummaging through his belongings and that the executing officers' discretion was not properly limited, the government states, first, that it does not intend to introduce at trial the two pink bags, gray Athlete's Foot notebook, and miscellaneous papers. [Doc. 30 at 2]. It further argues that the remaining items were seized within the scope of the warrant. First, it contends that the Arizona ID in the name of Leroy Smith was contained in the description in the warrant of " 'identification, and identification documents that would indicate other suspect(s) involved.' " [*Id.* at 3 (quoting [Doc. 23-1 at 1])].

As for the seizure of other clothing, the government points out that the warrant allowed the seizure of clothing worn by the robber during the robberies and that a white

45

tank top, gray shorts, black shorts, black Adidas slippers and a grey hooded sweatshirt were seized from Collins's home.  It notes that the warrant application stated that the May 21 9-1-1 caller reported that the shooter wore black Adidas flip-flops.  It adds that, while the warrant could have been more detailed, the clothing description was sufficient for the executing officers because they were limited to the clothing described by the victims.  [*Id.* at 4-5].  Accordingly, it points out that Goyal reported that the robber wore a black baseball cap, red shirt and black pants, [*id.* at 5 (quoting [Doc. 30-1 at 2)]; Teklu described the robber as wearing a white tank-top t-shirt, and grey basketball shorts, [*id.* (quoting Doc. 30-2 at 1]; Ahmed described the robber as wearing a black-and-grey hat, red-and-black t-shirt, black basketball shorts, and a black backpack, [*id.* at 6 (quoting Doc. 30-3 at 2)][9]; and the perpetrator of the May 21 shooting was described as wearing a " 'smoke gray hoody, black short pants and white socks with black flip flops (possibly Adidas brand), carrying a grey/black book bag and black handgun.' "  [*Id.* (quoting [Doc. 30-4 at 1-2]).  The government thus argues that the searchers did not seize a closet-full of clothes but only those items as to which they had probable cause to believe were worn by the robber.  The government also argues that the items were properly seized pursuant to the plain-view doctrine, since it was

_____

[9]       Ahmed also reported that the assailant had pierced ears.  [Doc. 30-3 at 2].

apparent that these pieces of clothing resembled those described by the victims and the incriminating nature of the clothing was immediately apparent. [*Id.* at 6]. Alternatively, the government argues that suppression is not mandated under the good-faith exception to the exclusionary rule. [*Id.* at 6-8].

As for the iPhone 4S and iPhone 4S boxes, the government contends that while the affidavit only described an iPhone 5, the investigation actually involved a series of robberies involving Craigslist ads for electronic devices including iPhones and iPads, and, in support, it cites the evidentiary hearing transcript (T55) and various police reports admitted as exhibits at the hearing to demonstrate that the additional iPhone boxes were seized under the plain-view exception, since some of the victims reported that the robber had stolen their iPhone 4s phones. [Doc. 30 at 8-9]. The government also argues that the items were seized in good faith because the warrant allowed seizure of "[a]ny property which was stolen from any of the robbery victims." [*Id.* at 9]. The government next argues that the Xfinity Technicolor modem was properly seized because the warrant permitted seizure of any device allowing connection to the Internet to place a Craigslist ad, or was properly seized in good faith. [*Id.*].

As for the black mask, the government states that it was located in the garage with other clothing and paperwork associated with Collins, and thus it was seized properly pursuant to good faith or plain view.  [*Id.* at 9-10].

### C.    Discussion

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*."   U.S. Const. amend. IV (emphasis added).   "This requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.' "   *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (quoting *Coolidge*, 403 U.S. at 467).  A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally overbroad and the resulting general search is unconstitutional.  *Stanford v. Texas,* 379 U.S. 476, 512 (1965); *United States v. Rousseau*, No. 14-14506, 2015 WL 6118716, at *3 (11th Cir. Oct. 19, 2015) (citing *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000)).   "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory

48

searches . . . ." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Andresen v. Maryland*, 427 U.S. 463, 479 (1976) ("This requirement makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (internal citation and quotation marks omitted)).[10]  In order to deter unconstitutional warrants and searches, any evidence so seized must be excluded from the trial of the defendant.  *Stone v. Powell,* 428 U.S. 465, 486 (1976); *Travers*, 233 F.3d at 1329.

A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized.  *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985); *Wuagneux*, 683 F.2d at 1349; *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A 1981).  A search warrant must indeed be sufficiently precise as not to permit a general search, but the test is the reasonableness of the description.  Elaborate specificity is unnecessary.  *See United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984); *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982); *Osborne*, 630 F.2d at 378.  "The standard is one of practical accuracy

---

[10]     However, as the Eleventh Circuit has pointed out, "if this statement were construed as a literal command, no search would be possible."  *Wuagneux*, 683 F.2d at 1349 n.4 (citing *Gurleski v. United States*, 405 F.2d 253 (5th Cir. 1968)).

49

rather than technical nicety." *Betancourt*, 734 F.2d at 755 (quotation marks omitted). If the applicant for the warrant cannot give an exact description, but has probable cause to believe that such materials exist, the warrant is sufficiently particular if it is as specific as the circumstances and nature of the activity under investigation permit. *Rousseau*, 2015 WL 6118716 at *3 (citing *Santarelli*, 778 F.2d at 614). Further, where it is not feasible at the time the warrant is issued to give an exact description of the materials to be seized, the warrant satisfies the Fourth Amendment's particularity requirement if it limits the seizure of items to only those items that constitute evidence of criminal activity. *Id.* (citing *Santarelli*, 778 F.2d at 615). That is, the test is whether the search was a general exploration or specifically directed to the means and instrumentalities by which the crime charged had been committed. *Harris v. United States*, 331 U.S. 145, 153-54 (1947). Furthermore, "an affidavit incorporated into a warrant by express reference and attached to and accompanying the warrant can cure ambiguity in the warrant itself." *United States v. Weinstein*, 762 F.2d 1522, 1531 (11th Cir. 1985) (citation omitted); *Wuagneux*, 683 F.2d at 1351 n.6; *see also United States v. Beckett*, 369 Fed. Appx. 52, 57 (11th Cir. Mar. 9, 2010) (same).

Applying these standards, the undersigned concludes that most of the fruits of the search warrant were properly seized. Initially, however, because the government

intends to not introduce the two pink bags, gray Athlete's Foot notebook, and miscellaneous papers, the undersigned **RECOMMENDS** that the motion be **GRANTED AS MOOT** as to those items.

The Court concludes, however, that the government has the better argument as to the Smith identification document and the modem, as the warrant specifically permitted the seizure of evidence concerning identification and identification documents to locate other participants in the crimes being investigated, and it authorized the seizure of any device which allowed the ad to be placed on Craigslist, which would logically include a modem.

The iPhone boxes and the other articles of clothing present a much closer issue. There is no indication that the warrant application was incorporated into the warrant, so there is no evidence that the executing officers could have had those items in mind when the warrant was executed. *See Groh v. Ramirez*, 540 U.S. 551, 560 (2004) (holding that search warrants can incorporate by reference the words of supporting documents if the documents are attached to the warrant). However, the warrant did allow for the search for and seizure of any devices with Internet access to place the Craigslist ad, including cell phones, and so the discovery of iPhone boxes would fall

51

AO 72A
(Rev.8/8
2)

within the scope of the warrant, since it was reasonable for the searching officers to infer that the boxes indicated possession of the contents of the boxes.

As to the clothing, there are three types of clothing seized. First, there is the clothing specifically discussed in the warrant application, that is, the Adidas flip-flops and the black book bag. Second, there is the clothing that was described in the reports to police by the victims, such as a white tank top, gray shorts, black shorts, and a grey hooded sweatshirt, as well as the Adidas flip-flops. Third, there is the clothing not mentioned in the application or the police reports, that is, the black mask.

The Court concludes that the first two categories of seizures were lawful, but that the black mask was improperly seized. First, the Court observes that this is not a case where the affiant could not have itemized the clothing worn by the robber on the list of items subject to seizure, as the victims here described particular pieces of clothing. Nonetheless, as to the clothing other than the mask, the warrant was not an impermissibly general warrant prohibited by the Fourth Amendment simply because it allowed to be seized clothing worn by the robber, because the clothing was tied to the specific crimes of the Craigslist robberies. The Supreme Court in *Andresen* rejected a claim that the phrase " 'together with other fruits, instrumentalities and evidence of crime at this (time) unknown' " rendered a warrant "fatally 'general.' " *Andresen*,

52

427 U.S. at 479.  In *Andresen*, the Court, in describing the warrant in that case, found that because the phrase was not a separate sentence, but rather appeared at the end of a sentence "containing a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T," it was "clear from the context that the term 'crime' in the warrants refers only to the crime of false pretenses with respect to the sale of lot 13T." *Id.* at 480-81.  It concluded that the warrants, thus construed, did not authorize a general search for evidence of any crime but "only to search for and seize evidence relevant to the crime of false pretenses and Lot 13T." *Id.* at 482; *see also United States v. Pindell*, 336 F.3d 1049, 1053-54 (D.C. Cir. 2003) (upholding warrant, despite catch-all phrase, because the phrase was part of list of evidence relating to a particular violation); *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982) (finding catch-all phrase did not render warrant general when it was attached to list of items described "in both specific and inclusive generic terms"); *United States v. Soto*, 779 F. Supp. 2d 208, 221 (D. Mass. 2011) (" 'Catch-all' clauses . . . which authorize the seizure of all 'other fruits, instrumentalities and evidence of crime at this (time) unknown,' are acceptable if linked to specific criminal episodes described in the warrant.").

53

In the present case, the warrant authorized the seizure of the "clothing worn by the suspect during the armed robbery incidents," [Doc. 23-1 at 1], which sufficiently limited the searchers' discretion and, as a result, did not render the warrant a general warrant.

Second, even if the warrant was overly broad or a general warrant as to the seizure of these clothing items, the seizure of these items is saved from suppression by the good-faith exception to the exclusionary rule. The Supreme Court, in *United States v. Leon*, 468 U.S. 897 (1984), established what has become known as the good-faith exception to the exclusionary rule, to be applied when law enforcement officers executing the warrant act "in the objectively reasonable belief that their conduct does not violate the Fourth Amendment." *Id.* at 918. The Eleventh Circuit has squarely held that the good-faith exception applies to general and overbroad search warrants. *See e.g., United States v. Cruse*, 343 Fed. Appx. 462, 465 (11th Cir. Aug. 26, 2009) (general warrant; holding that a warrant which listed specific items and locations to be seized and included a "catch-all" provision is not rendered "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid"); *United States v. Haynes*, 160 Fed. Appx. 940, 943-44 (11th Cir. Dec. 28, 2005) (overbroad warrant, citing *Travers*, 233 F.3d at 1330); *Travers, id.* (overbroad warrant, but noting that officers do

54

not act in objective good faith, however, if warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid).

Here, the government met its burden to establish good faith as to the Adidas flip-flops and black book bag because under *United States v. Robinson*, 336 F.3d 1293, 1297 & n. 6 (11th Cir. 2003), the government may satisfy its burden under *Leon* by reference to the facts stated in the affidavit. Second, the police reports in evidence at the evidentiary hearing establish the good-faith seizure of the white tank top, gray shorts, black shorts and grey hooded sweatshirt, because these were items of clothing described by the victims as having been worn by the robber. The Eleventh Circuit has held that courts may consider information outside the four corners of the search-warrant affidavit to determine whether the officers acted in good faith in relying upon a warrant which might be invalid. *United States v. Martin*, 297 F.3d 1308, 1318 (11th Cir. 2002).

On the other hand, the government has not met its burden on good faith as to the black mask. This item was not described in the warrant, the affidavit in support of the warrant, or in any reports by the victims. Its seizure was without probable cause, and it therefore should be suppressed.

55

For all of the foregoing reasons, the undersigned **RECOMMENDS** that Collins's motion to suppress evidence from the search of his residence, [Doc. 18], be **GRANTED IN PART AND DENIED IN PART** as indicated above.

### III.   *Out-of-Court Photo Identifications*

### A.   *Facts*

The evidence at the hearing established the following. Michael Bednarz was an investigator with the DeKalb County Solicitor's Office, and in May 2013, was part of a task force investigating robberies involving Craigslist. T51-54. The investigation focused on a series of armed robberies involving Craigslist: the victims were Craigslist customers who responded to advertisements for iPhones or Android cell phones and were then robbed at gunpoint when they showed up to buy the devices. T55. As part of the investigation, law enforcement assembled a photo array using a computer program called Imaging, which indexes the book-in photos from the DeKalb County jail. T56. The program selects a number of photographs based on characteristics chosen by the compiler of the array, based on the physical features of the known suspect, which group is then culled manually by the array compiler into a six-person photo array. T56-57. Because there was no report that the Craigslist robber(s) wore earrings, in the arrays created in this case, any earrings were covered up with a

56

permanent marker and appeared as black dots on the tip of the ears of the person depicted in the array.  T71-72.

On May 30, 2013, Bednarz and the case investigator, DeKalb County Police Detective Jackson, showed such an array containing Collins's photograph to Mr. Tran, a victim of one of the Craigslist robberies.  Tran first was interviewed by Bednarz and Jackson.  T58.  He was asked open-ended questions.  T79.  He reported that he had responded to a Craigslist ad for an iPhone on May 16.  He communicated via telephone with the seller, "Jonathan," and agreed to meet him at a McDonald's restaurant off North Hairston Road.   Jonathan called Tran, and advised that he did not have transportation and told Tran to meet him instead at an address off Walnut Ridgeway. After Tran showed up at the second address, he was approached by a black male who tried to gain entry into the victim's car.  Tran got out of the vehicle and the black male grabbed him, pulled out a weapon and demanded the Tran's money.   Tran stated that the money was in the vehicle's trunk, and as they approached the trunk, Tran slipped out of the robber's hold and ran away.  He then flagged another person down and was able to call 9-1-1.  T58-59.  Tran identified the robber as dark-skinned, T71, and described his clothing and a tattoo.  T78.  The robbery occurred in the middle of the day.  T77.  Tran also gave a written statement.  T80; Gov't. Ex. 2A.

57

After being interviewed by the officers, Tran was shown a Photographic Lineup Admonition form, which stated, in material part, as follows:

> In a moment, I am going to show you a group of photographs that may or may not contain a picture of a person now being investigated.

> The fact that photographs are being shown to you should not cause you to believe that anyone has been or will be arrested.

> Remember: when viewing a group of photographs you should consider the lighting and how it might affect the complexion of some persons, making them appear lighter or darker. You should also consider the fact that hair styles, facial hair, scars, marks, etc. can be easily changed, added, or taken away. Finally, do not allow yourself to be distracted by any background scenery since photographs are sometimes taken at different locations or obtained from a variety of sources.

> Please take your time and study the photographs carefully. Do not allow yourself to be influenced by any police officer present. Once you have viewed the photographs, you will be asked to record your viewing.

Gov't Ex. 2 [Doc. 20-2 at 1]; T60-61. Jackson read the form to Tran in its entirety, and Tran stated that he understood the form. T61. Attached to the form was a photo array containing six color photographs, which Jackson then slid across the table to Tran to view. After viewing the array for fifteen to twenty seconds, Tran covered all but the photograph in the number 4 position with his hands. He then pointed to and circled the photograph in the fourth position, and in response to Jackson's asking for a percentage of certainty, wrote that he was "70% sure" and affixed his initials. T61-62, 75-76, 82.

58

Collins was the person depicted in the fourth position.  T64.  After signing another admonition form, Tran reviewed second photo array, which contained another suspect, but Tran did not identify any person in the second photo array.  Gov't Ex. 3; T65-66, 77.

DeKalb Police Detective Allford Brown also was involved in the Craigslist robbery investigation, and he showed photo arrays to six witnesses.  T87.  On May 29, 2013, he showed an array to Mr. Teklu.  T88.  Brown telephoned Teklu and asked if he could come in to view a lineup.  T88.  Detective Dickerson also was present as a witness.  T89.  Brown read Tecklu the same admonition form quoted earlier, Gov't Ex. 4, and in showing him the first array, Tecklu stated he was "50% sure" the robber was the person in the fifth position, which depicted a person who was not a suspect.  T91.  Collins was not depicted in that array.  Teklu did not identify anyone in Gov't Ex. 5, which array included Collins in the fourth position.  T92.   Nor did he identify anyone in Gov't Ex. 6, which included a suspect in the fifth position (not Collins).  T92-93.

Also on May 29, 2013, Brown and Jackson interviewed another victim, Mr. Goyal, at his apartment (because he did not have transportation to the police station), after having advised Goyal that they were coming over to take a statement and

59

show him a lineup.  T93-94, 121.  Both detectives were in plainclothes.  Because Goyal did not have a table, the interview and lineup review were conducted on the apartment floor.  T93-94.  They interviewed him first and then he wrote out his statement.  T96. Goyal was a student, and although he spoke with a foreign accent, the detectives were able to understand him and he did not appear confused by what the detectives were saying.  T122.  He described his assailant as dark-skinned.  T123.  He did not say anything about the suspect wearing earrings.  T123.  He was given the admonition form before being shown each lineup.  T95-99; Gov't Exs. 7-9.  Goyal did not recognize anyone in Gov't Ex. 7, although a suspect was included at position 3.  He circled Collins's photo in position 4 on Gov't Ex. 8 and wrote that he was "50% sure."  T98. He did not recognize anyone in Gov't Ex. 9.  T99.

On May 30, 2013, Brown and Jackson interviewed another victim, Mr. Ahmed, at CID headquarters.  T100.  Ahmed arrived with his wife, who also was a witness. T101.  Mr. Ahmed was read the admonition form, and was unable to identify anyone in Gov't Ex. 10, which array contained Collins in position 4.  T102.  He also did not recognize anyone in Gov't Ex. 11.

Ms. Ahmed was interviewed next, and because she did not speak English, Mr. Ahmed translated for her.  T103-04.  After being given the admonition form as

60

translated by her husband, Ms. Ahmed stated that she was 50% certain that she recognized the person in position 6 in Gov't Ex. 12, and 40% certain as to the person in position 5 in Gov't Ex. 13. T104-05. That person was not a suspect. T105.

On May 21, 2013, Brown and Jackson interviewed Ms. Whitley as the detectives were canvassing a location, following a report of shots fired in connection with a Craigslist incident. T105. Whitley stated that she heard shots fired and when she went to her window, she saw a person running across her yard carrying a gun. She described the person and the clothing he was wearing. T106. On May 30, 2013, the detectives met with Whitley at her home. T107-08. The detectives told her that they wanted to talk to her again and show her a lineup. T108. After giving her the admonition form to review, Whitley was shown a photo array, Gov't Ex. 14, and almost immediately she pointed to the photo of Collins in position 4 and stated, "This is the guy." T109. She wrote on the array, "This is the guy I saw pointing the pistol" and she circled the photo. T109. She did not identify any person depicted in Gov't Ex. 15. T111.

In his photo in the array, Collins appears to be wearing a sweatshirt, but Brown did not know whether the photo was taken when Collins was arrested. T128. Whitley had stated that the person she saw in her front yard wore a sweatshirt with a distinctive emblem upon it, and Jackson advised her that he was going to show her a photograph

61

of a sweatshirt[11] and asked her to tell him if it looks like the sweatshirt she saw.  When he placed the photograph of a sweatshirt in front of her, Gov't Ex. 16, Whitley stated it was and wrote, "This is the shirt.  This shirt favors the shirt the suspect was wearing." T111-12; Gov't Ex. 16.  Neither detective told her where the photo came from.  T112.

Brown and Jackson also interviewed Mr. Lusanga, another Craigslist robbery victim.  Lusanga identified a person in position 1 on Gov't Ex. 17, writing that "This is the person who robbed me."  That person was not a suspect.  T116.  Collins was in position 4 in that array.  He did not identify anyone in Gov't Exs. 18 or 19.  T117-18.

### B.    *Arguments of the Parties*

Collins argues that several facts rendered the identification procedures unduly suggestive.  First, only persons depicted in positions 2, 3, and 4 had dark frames around their photographs, and Tran, Goyal, and Whitley all described a suspect with dark skin, but only positions 3 and 4 (Collins) had dark skin.  [Doc. 29 at 5-6].  He also complains that although none of the witnesses described the robber as having worn earrings, the person in position 3 was wearing earrings which Jackson blacked out.  He further notes that in another lineup not containing Collins but containing another suspect, Jackson

---

[11]     Her full description was of black male, approximately 5'11"-6', dark skin, smoke gray sweatshirt hoody with orange lettering, black pants to the knees, white socks, and black and white Adidas slippers.  T113.

AO 72A
(Rev.8/8
2)

blacked out the earlobes of all those in the array so the witness would not be swayed. [*Id.* at 6]. Thus, he argues that the array drew attention to Collins's photo as the only person with no earrings, dark skin and a frame around it. [*Id.*]. Finally, he argues that no other person was wearing a dark sweatshirt, which was the clothing Whitley claimed the shooter was wearing. [*Id.*].[12]

The government argues that the photo lineups were not impermissibly suggestive. [Doc. 30 at 14]. It argues that the dark frame around Collins's photo and that his photo along with two others had darker complexions are not significant enough, particularly in light of the admonition, since the images depicted in the photographs were similar. [*Id.* at 15]. It contends that each photo depicted an African-American male roughly the same age as Collins, with similar features, facial hair, hairstyles, poses, and proportion; other than in one photo, each person was wearing a dark-colored shirt; and each subject had the same facial expression. [*Id.* at 15]. It also argues that the fact that so few of the witnesses made a positive identification undermines Collins's

_____

[12]     He also argues that in addition to suppressing the firearm and the ammunition, the Court should suppress Whitley's identification, because without the ballistic analysis which matched the shell casings located outside her house with the firearm seized from the hotel, Collins would not have been tied to the shooting outside of her home. [Doc. 29 at 18]. Since the Court has concluded that the seizure of the firearm was lawful, this argument is rejected.

arguments that the array or the procedures were unduly suggestive.  [*Id.* at 15-16]. Finally, the government argues that contrary to Collins's argument, one witness, Mr. Ahmed, did identify the assailant as having earrings, and thus the failure to cover up the earrings was not suggestive.  [*Id.* at 16].

The government next argues that if the Court reaches the reliability prong, the identifications of Tran, Goyal and Whitley were reliable.  [*Id.* at 17-18].

### C.    Discussion

The Supreme Court established the due process standard against which police identification procedures are to be measured in *Stovall v. Denno*, 388 U.S. 293 (1967). A violation of due process occurs when, under "the totality of the circumstances," a confrontation procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

Courts employ a two-part test for determining whether an out-of-court identification can properly be admitted. *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015).  First, the Court determines whether the original identification procedure was unduly suggestive. *United States v. Ford*, 784 F.3d 1386, 1391 (11th Cir. 2015); *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006).  A finding of impermissible suggestiveness raises concern over the reliability of

64

identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification. *Allen v. Estelle*, 568 F.2d 1108, 1113 (5th Cir. 1978). Claims that the circumstances of a police identification procedure are so unnecessarily suggestive as to produce irreparable misidentification must be evaluated in light of the totality of the surrounding circumstances. *Nettles v. Wainwright,* 677 F.2d 410, 414 (11th Cir. 1982); *Rudd v. State of Fla.*, 477 F.2d 805, 811 (5th Cir. 1973) ("Pretrial identification procedures should not be found impermissibly suggestive on the basis of rigid application of categorical rules. For example, indicia of reliability such as a witness's strong recollection from an independent, untainted source may in some cases counteract the suggestiveness in certain identification procedures.  Also, exigencies of efficient police work may occasionally justify identification  procedures that in other contexts would be unnecessarily suggestive.  Because of these and other variables spanning the range of human experience, courts have wisely counseled against determination of constitutionally impermissible suggestiveness on other than a case-by-case basis."). When determining whether a photo array is unduly suggestive, courts consider the size of the array, the manner of its presentation, and the details of the photographs in the array.  *Perkins*, 787 F.3d at 1344.  However, minor differences in hair and facial

65

features do not necessarily render a photographic lineup unduly suggestive. *See Williams v. Weldon*, 826 F.2d 1018, 1021-22 (11th Cir. 1987) (absent differences in appearance tending to isolate accused's photo, identification procedure not unnecessarily subjective solely because display did not depict persons of same race or ethnic group). In *Foster v. California*, 394 U.S. 440 (1969), the Court held that a lineup is unduly suggestive when it is virtually inevitable that the witness will select the individual whom the police have singled out. This rule, unlike the exclusionary rule of the Fourth Amendment, is aimed not at deterring unfair police practices but at the reliability *vel non* of the truth-finding process. *See id.* If the Court finds that the the original identification procedure was not unduly suggestive, that ends the inquiry. *Williams*, 826 F.2d at 1021.

The defendant has the burden of showing that the eyewitness identification was derived through "impermissibly suggestive" means. *Perry v. New Hampshire*, 132 S. Ct. 716, 733 (2012); *Simmons*, 390 U.S. at 384; *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). Only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure. *United States v. Wade*, 388 U.S. 218, 240 & n.31 (1967); *United States v. Sanchez*,

AO 72A
(Rev.8/8
2)

24 F.3d 1259, 1261-62 (10th Cir. 1994); *United States v. Mustafa*,  Crim. Action No. 1:11-CR-0234-1-CAP, 2012 WL 1903255, at *2 (N.D. Ga. May 25, 2012).

If the procedures utilized were unduly suggestive, the Court then considers whether, under the totality of the circumstances, "the identification was nonetheless reliable." *Brown*, 441 F.3d at 1350 (citing *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001)).  The factors that go into this "totality of the circumstances" test include: the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification.  *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991) (footnote omitted).

The Court first concludes that Collins did not satisfy his burden to establish that the array or the procedures utilized were unduly suggestive.  First, the admonition given to each eyewitness warned them not to conclude that the person was in the array and explained that the witness should not be influenced by complexions or backgrounds. Second, Collins's complaints about the thin border around his photo and the darker background (in position no. 4 in Govt Exs. 2, 5, 8, 10, 12, 14 and 17) are of no moment, since the persons in positions nos. 2 and 3 had a similar border and darker background. Third, Collins's photo does not depict a skin color that was materially different from

67

the skin color of the other persons depicted, and the admonition given the eyewitnesses warned them about over-reliance on complexions.  Fourth, although the persons at position nos. 1 and 3 appear to be wearing earrings, the other four persons, including Collins, are not displayed with earrings.  Fifth, although Collins appears to be the only person wearing a hooded or large-collared sweatshirt, all but the person depicted in position no. 1 were depicting wearing dark-color tops, and the person in position no. 6 also was wearing what appears to be a sweatshirt or athletic jacket with a large collar. Sixth, the Court notes that Collins was not identified in Gov't Exs. 5 or 10, and in two of the displays, persons other than Collins were picked (Gov't Exs. 12, 17), thus lending support to this conclusion that the array was not overly suggestive.

Even if the array was suggestive, the identifications of Collins were reliable. First, the Supreme Court has held that eyewitness reliability is largely a matter for the jury.  *Perry*, 132 S. Ct. at 728-29; *O'Brien v. Wainwright*, 738 F.2d 1139, 1143 (11th Cir. 1984) (describing weaknesses in identification as " 'grist for the jury mill' ") (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)).  Second, in any event, each of the witnesses that made at least a partial positive identification of Collins had the opportunity to view the perpetrator.  Tran was engaged in a struggle with the assailant, Gov't Ex. 2a; Goyal observed the robber in front of the Kroger store and when the

AO 72A
(Rev.8/8
2)

robber entered Goyal's vehicle, Gov't Ex. 7a; and Whitley saw the suspect as he ran across her yard.  Gov't Ex. 14a.  It also appears from these eyewitnesses' statements that they were paying close attention to the suspect: Tran's statement contained a detailed description of his assailant and the clothes he was wearing, Gov't Ex. 2a; Goyal's statement described the actions of the perpetrator (that he "tensed" and looked about), Gov't Ex. 7a; and Whitley gave a detailed description of the shooter and his conduct, Gov't Ex. 14a.  Moreover, their descriptions of the assailant tended to be generally consistent.  Also, they each gave varying degrees of the level of certainty (Tran, 70% (Gov't Ex. 2); Goyal, 50% (Gov't Ex. 8); Whitley, "This is the guy I saw pointing the pistol." (Gov't Ex. 14).  Finally, Tran and Whitley's identifications were eight days after the incidents involving them, while Goyal's identification occurred slightly more than three weeks later.  *See* Def. Ex. 1 (Goyal reported being robbed on May 6, 2014).  All of these facts point to reliability, or at least warrant submission of that issue to the jury.

Accordingly, the undersigned **RECOMMENDS** that Collins's motion to exclude identification testimony, [Doc. 20], be **DENIED**.

**IV.**     ***Motion to Dismiss Counts 2, 4, 6, 8, and 10***

In Counts 1, 3, 5, 7, and 9, Collins is charged with violation of the Hobbs Act, 18 U.S.C. § 1951, by unlawfully taking and obtaining personal property from a victim, against the victim's will and "by means of actual and threatened force, violence, and fear of injury, immediate and future" to the victim's person.  Counts 2, 4, 6, 8, and 10 of the indictment charge Collins with violating 18 U.S.C. § 924(c) by using, carrying, and brandishing[13] a firearm in relation to a crime of violence, the underlying "crime of violence" in each count being the robbery described in the count immediately preceding it (Counts 1, 3, 5, 7, and 9, respectively).

Collins contends that the Hobbs Act charges underlying each § 924(c) charge categorically fail to qualify as a "crime of violence" within the meaning of the "force clause"  of  18  U.S.C.  §  924(c)(3)(A);  that  the  "residual  clause"  of 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague following the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015); and thus, that Counts 2, 4, 6, 8, and 10 do not state an offense and must be dismissed.  [Doc. 36 at 1-2].

---

[13]     "Brandish" is defined as "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. § 924(c)(4).

The Hobbs Act, which is codified, in relevant part, at 18 U.S.C. § 1951(a), (b)(1),

provides that

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

> (b) As used in this section--(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(a), (b)(1).  Section 924(c)(1)(A) provides, in relevant part, that

> [A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . [be sentenced to a mandatory minimum term of imprisonment].

18 U.S.C. § 924(c)(1)(A).  Pursuant to 18 U.S.C. § 924(c)(3), a "crime of violence" is

defined as "an offense that is a felony and—(A) has as an element the use, attempted

use, or threatened use of physical force against the person or property of another

[("the 'force' clause")], or (B) that by its nature, involves a substantial risk that physical

71

force against the person or property of another may be used in the course of committing the offense [("the 'residual' clause")]."  18 U.S.C. § 924(c)(3).

### A.    Arguments

Collins first argues that Hobbs Act robbery under § 1951 is not a "crime of violence" within the meaning of the "force" clause of § 924(c)(3)(A).  [Doc. 36 at 5-8]. He argues that to determine if the predicate crime is a "crime of violence" under the "force" clause, the Court must use the "categorical approach" set forth in *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013), and *United States v. McGuire*, 706 F.3d 1333, 1336-37 (11th Cir. 2013), which approach requires the Court to determine whether the defendant "committed 'an offense' that 'has *as an element* the use, attempted use, or threatened use of physical force against the person or property of another,' or that '*by its nature*, involves a substantial risk that physical force may be used.' "  *McGuire*, 706 F.3d at 1336-37 [quoted in Doc. 36 at 5].  Collins submits that, in performing this analysis, the Court is to look only at the statutory definitions—*i.e.*, the elements of the offense—and not to the facts of the case, to see if it qualifies as a crime of violence.  [Doc. 36 at 5].  He further contends that under the categorical approach, a crime is a "crime of violence" only if all of the criminal conduct covered by the statute matches or is narrower than the statutory definition of "crime of

72

violence"; that is, if the most innocent conduct penalized by the statute does not constitute a "crime of violence," then the statute categorically fails to show that he was charged with a "crime of violence." [*Id.* at 6]. Collins then goes on to submit that to be a "crime of violence" under the "force" clause, 18 U.S.C. § 924(c)(3)(A), the offense must have as an element "physical force," which he argues is defined as "violent force," that is " 'strong physical force' . . . 'capable of causing physical pain or injury to another person.' " [*Id.* at 6-7 (quoting *Johnson v. United States*, 559 U.S. 133, 140 (2010) (hereinafter "*Curtis Johnson*") (which analogized the term "violent felony" under Armed Career Criminal Act ("ACCA"),[14] 18 U.S.C. § 924(e)(2)(B)(i), with reference to the definition of "crime of violence" under 18 U.S.C. § 16)].

Collins then argues that a charge of Hobbs Act robbery, as defined in § 1951(b), does not categorically meet the "violent force" requirement because, according to the text of the statute, it is possible for Hobbs Act robbery be accomplished by putting someone in fear of future injury to his property. [Doc. 36 at 7]. He points out that the Eleventh Circuit pattern jury instructions define "fear" as "a state of anxious concern, alarm, or anticipation of harm" that "includes the fear of financial loss as well as fear

---

[14]     "The ACCA increases the sentences of certain federal defendants who have three prior convictions 'for a violent felony.' " *Descamps*, 133 S. Ct. at 2281.

73

of physical violence." [*Id.* (quoting Eleventh Circuit Pattern Jury Instructions (Criminal) 70.3 (2010))]. He therefore submits—hypothetically—that "[a] person could commit Hobbs Act robbery by obtaining the victim's wallet by threatening to infringe on his copyright five years in the future, or threatening to stop allowing him use of an easement" and that Hobbs Act robbery therefore does not require the use, or attempted use, or threatened use of "violent force." [Doc. 36 at 7].

Collins also submits that, after the Supreme Court's most recent *Johnson* decision, issued late last June, no conviction can be had under the "residual" clause, § 924(c)(3)(B), because it is void for vagueness. [Doc. 36 at 8-17]. In *Johnson*, the Supreme Court held that the "residual" clause in the ACCA, 18 U.S.C. § 924(e)(2)(B), which defines a "violent felony" as "burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another" and is often viewed as an analogue to the residual clause at issue in the present matter, violates due process because it denies fair notice to defendants and invites arbitrary enforcement by judges. *Johnson*, 135 S. Ct. at 2556 (considering the application of the ACCA's residual clause to the defendant's prior conviction under Minnesota's offense of unlawful possession of a short-barreled shotgun). Collins points out that in *Johnson*, the Court recognized that, just like the

74

analysis under the "force" clause, analysis of a violent crime under the "residual" clause employs the categorical approach and requires a court to determine how the law defines the offense and not how an individual in the case might have violated it. [Doc. 36 at 9]. Collins also points out that in *Johnson*, the Court found the categorical approach problematic in light of the "serious potential risk" language in the ACCA's residual clause because it required courts to consider the statutory violation in general and determine whether, in "the ordinary case," such violation would present a serious potential risk of injury to another, and it therefore relied too much on guesswork and intuition, which the Court concluded offended due process. [*Id.* at 9-11]. Collins also notes that the *Johnson* Court found that the ACCA residual clause lacked a meaningful gauge for determining whether the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." [*Id.* at 12-13].

Thus, Collins submits, that when the Court in *Johnson* determined that the ACCA's "residual" clause was unconstitutional, in invalidated not only that clause, but also the "ordinary" case analysis and other statutory provisions that require such analytical framework. [*Id.* at 13]. He then goes on to argue that the statutory phrase at issue in *Johnson* ("risk of injury") is essentially the same as the one in issue in this

75

case ("risk of force"), the same constitutional analysis applies, and the § 924(c)(3)(B) residual clause likewise offends due process. [*Id.* at 13-18 & nn.2-4].

In response, the government first asserts that no court has held that a Hobbs Act robbery is not a "crime of violence" for purposes of § 924(c). [Doc. 43 at 2]. It represents that instead, courts have universally held that a violation of § 924(c) may be based upon the use, brandishing, or discharge of a firearm in the context of a Hobbs Act robbery, although cases that have decided the issue have used a variety of rationales to reach that conclusion. [*Id.*]. It also points out that Collins's theories rely on a string of Supreme Court cases that deal with retrospective analysis of prior convictions for the purposes of applying sentencing enhancements based on criminal history and are therefore distinguishable from the matter at hand, which is still in pretrial litigation. [*Id.* at 3].

Second, the government contends that the Court should reject Collins's "force clause" arguments because § 1951 is a divisible statute, that is, a statute that explicitly lists alternative elements or means of commission, which *Descamps* held permitted courts to employ a modified categorical approach and to look at certain case documents to determine whether the statute, as charged, meets the definition of a "crime of violence." [*Id.* at 6-7 (citations omitted)]. In support of its argument, the government

76

analogizes the Hobbs Act to the burglary statute at issue in *Shepard v. United States*, 544 U.S. 13 (2005), where the Supreme Court observed that the Massachusetts burglary statute prohibited three types of burglary offenses, since the Hobbs Act similarly prohibits three different crimes that interfere with commerce: robbery, extortion, or committing or threatening physical violence to a person or property. [Doc. 43 at 7]. The government also cites to cases which have held that the Hobbs Act was divisible under the *Descamps*/*Shepard* analysis. [*Id.* at 8 (citing *United States v. Mackie*, No. 3:14-CR-00183-MOC, 2015 WL 5732554, at *3 (W.D.N.C. Sept. 30, 2015); *United States v. Redmond*, No. 3:14-CR-00226-MOC, 2015 WL 5999317, at *3 (W.D.N.C. Oct. 13, 2015); *United States v. Brownlow*, No. 1:15-CR-0034-SLB-SGC, 2015 WL 6452620, at *4 (N.D. Ala. Oct. 26, 2015)].

The government submits, therefore, that it is permitted to select from the alternative offense elements, and the alternate means of committing robbery, to clarify which Hobbs Act offense is being charged and that the Court is authorized to consult the indictment, a "*Shepard*-approved document," to determine whether the charge meets the definition of "crime of violence." [Doc. 43 at 8]. The government thus contends that because the Hobbs Act counts here allege that Defendant "unlawfully took, or attempted to take the victim's property 'against [the victim's] will by means

77

of actual and threatened force, violence, and fear of injury, immediate and future, to [the victim's] person,' " [Doc. 1, *passim*], each Hobbs Act count therefore had as an element the use, attempted use, or threatened use of physical force against the person of the victims, and thus qualifies as a "crime of violence" under the "force" clause of § 924(c).  [*Id.* at 8-9].

The government then argues that before *Descamps*, several courts of appeal had held that an extortion under the Hobbs Act would not fit § 924(c)'s "crime of violence" definition and thus applied the modified categorical approach in examining the indictment or jury instructions to conclude that Hobbs Act robbery nevertheless qualified as a "crime of violence" for the purposes of § 924(c).  [*Id.* at 9 (citations omitted)].  It therefore argues that *Descamps* changed the analysis only for crimes that are indivisible.  [*Id.*].

Third, the government argues that, even applying the categorical approach, Hobbs Act robberies contain as an element the actual, attempted, or threatened use of physical force against person or property and therefore are "crimes of violence" under the "force" clause of § 924(c)(3)(A).  [*Id.* at 10 (citing *United States v. Farmer*, 73 F.3d 836, 842 (8th Cir. 1996); *United States v. Merinord*, No. 5:15-CR-136, 2015 WL 6457166, at *5 (E.D.N.C. Oct. 26, 2015); *United States v. Hunter*,

78

No. 2:12CR124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015); *United States v. Standberry*, — F. Supp. 3d —, No. 3:15CR102-HEH, 2015 WL 5920008, at *5 (E.D. Va. Oct. 9, 2015))]. It disputes the applicability of Collins's incorporation of "strong physical force" into the force requirement under § 924(c), since the force involved in *Curtis Johnson*, 559 U.S. at 139-40, was that as defined in the ACCA, which is limited to force against the person, whereas the force involved in § 924(c) also involves force against property. [*Id.* at 11-12 (*comparing* § 924(e)(2)(B)(i) *with* § 924(c)(3)(A))]. It also points out that the *Curtis Johnson* court specifically included within the definitions of "physical force" and "crime of violence" in that case the " '[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim.' " [*Id.* at 11 (quoting *Johnson*, 559 U.S. at 139)].

The government then argues that the Eleventh Circuit in *McGuire* applied the categorical approach in determining that 18 U.S.C. § 32(a)(1), which prohibits the attempt to wreck, damage, or destroy an aircraft in the special maritime jurisdiction of the United States, was a "crime of violence" for purposes of § 924(c). [Doc. 43 at 12]. It asserts that the analysis in *McGuire* required the court to ask whether commission of the offense, in general, plausibly covered any non-violent means and points out that the threat to property in *McGuire* was essential to the court's finding that each of the ways

79

of committing the crime qualified as a "crime of violence." [*Id.* (citing *McGuire*, 706 F.3d at 1336-37)].

Next, the government argues that while the Eleventh Circuit has not decided that a Hobbs Act robbery categorically qualifies as a "crime of violence" for the purposes of the § 924(c) "force" clause, it has found robbery in other circumstances to be a "crime of violence." [Doc. 43 at 12-13 (citing *United States v. Lockley*, 632 F.3d 1238, 1243-44 (11th Cir. 2011) (concluding that Florida robbery statute was "crime of violence" under the federal sentencing guidelines despite its criminalization of the use of intimidation or fear, and not merely force or violence, to obtain the property of another, finding the generic definition of robbery to be "the taking of property from another person or from the immediate presence of another person by force *or* intimidation"))]. The government further contends that Hobbs Act robbery tracks common-law robbery and that courts have held that common-law robberies are proper predicate offenses under ACCA. [Doc. 43 at 13-14 (citations omitted)]. Further, the government points out that the Eleventh Circuit has found in other contexts that robbery statutes are crimes of violence where they criminalize acts that place a victim "in fear." [*Id.* at 14-15 (citations omitted)].

80

The government also argues that the Court need not reach Collins's attack on the § 924(c)(3)(B) "residual" clause if it rejects Collins's arguments as to the force clause. [Doc. 43 at 15]. It contends, however, that if the Court does reach it, Collins's challenge should fail because the cases upon which he bases his argument were retrospective analyses of prior convictions, whereas in the present case, a jury has not found any facts. [*Id.* at 16]. It also contends that there are significant and material differences between the ACCA's residual clause and the residual clause at issue in this case, such that although the ACCA's residual clause has been found unconstitutionally vague, § 924(c)'s residual clause is not. [*Id.* at 16-23]. First, the government contends that § 924(c)'s residual clause does not contain an introductory list of enumerated offenses which caused the *Johnson* Court concern that the ACCA residual clause was confusing and lacked a meaningful gauge for determining whether the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." [*Id.* at 18-20 (citations omitted)]. Second, the government contends that unlike the ACCA residual clause in *Johnson*, the § 924(c) residual clause does not have the ambiguity of "involves conduct" but rather calls upon the factfinder to determine if the "risk of force occurs 'in the course of committing the offense,' " [*id.* at 21 (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 10 & n.7 (2004))

81

(quotation marks altered)], and therefore, is narrowly confined to determining the risk of "use of force" during the commission of the offense rather than bigger question of whether the offense "involves conduct that presents a serious potential risk of physical injury to another," during or after the commission of the offense, which is the risk at issue under the ACCA.  [*Id.* at 22].  Third, the government submits that unlike the ACCA residual clause, the § 924(c) residual clause has not undergone repeated attempts by the Supreme Court to construe it within constitutional bounds.  [*Id.* at 22-23].

In reply to the government's "force clause" arguments, Collins concedes that § 1951(a) is divisible into two or more crimes, including robbery, and that the Court may use the modified-categorical approach and refer to the indictment to determine that he is charged with Hobbs Act robbery, as opposed to another Hobbs Act violation. [Doc. 46 at 1-4].  He argues, however, that Hobbs Act robbery is not further divisible because § 1951(b)(1) does not list multiple, alternative *elements* of Hobbs Act robbery (thereby creating multiple versions of Hobbs Act robbery) but instead lists multiple alternative *means* of committing Hobbs Act robbery. [*Id.* at 2, 5-9 (citing *Omargharib v. Holder*, 775 F.3d 192, 198-99 (4th Cir. 2014); *United States v. Estrella*, 758 F.3d 1239, 1246 (11th Cir. 2014))].  He points to the Eleventh Circuit's Pattern Jury Charges for support, [Doc. 46 at 8 (citing 11th Circuit Pattern Jury Instruction

82

(Criminal) 70.3 (2010))], arguing that the pattern charge demonstrates that there are different ways to commit the crime of Hobbs Act robbery—*i.e.*, different ways to take the victim's property against his will—rather than alternative elements describing different crimes, and thus that the statute is not divisible, [Doc. 46 at 9 (citing *United States v. Evans*, No. 5:15-CR-57-H, 2015 WL 6673182, at *3 (E.D.N.C. Oct. 20, 2015))].

Collins contends, therefore, that the government's position that the Court should—as the courts did in *Mackie*, *Redmond*, and *Brownlow*—rely on the indictment's allegations that "defendant unlawfully took, or attempted to take the victim's property 'against [the victim's] will by means of actual and threatened force, violence, and fear of injury, immediate and future, to [the victim's] person,' " has the effect of urging the Court to make an impermissible factual inquiry like the one criticized by the Supreme Court in *Descamps* and precluded under *McGuire*. [Doc. 46 at 2, 4-6 (citing *Descamps*, 133 S. Ct. at 2285-87; *McGuire*, 706 F.3d at 1336)].  Accordingly, Collins argues that, under *Descamps*, the Court may not examine the indictment's allegations regarding the means by which he is accused of committing Hobbs Act robbery, but instead, the Court must decide whether the "most innocent conduct" that may be penalized as a Hobbs Act robbery under

AO 72A
(Rev.8/8
2)

§ 1951(b)(1) necessarily involves the use, attempted use, or threatened use of physical force.  [Doc. 46 at 2, 9-10].

Collins then goes on to argue that, contrary to the holdings in *Standberry*, *Merinord*, and *Hunter*, the district-court cases relied upon by the government, Hobbs Act robbery is not a "crime of violence" under the categorical approach because the most innocent conduct chargeable under the statute—the taking of personal property by means of creating fear of future damage to property—may be committed without force.  [*Id.* at 11-13].  In support, he alludes to his previous hypothetical example that a person could commit Hobbs Act robbery by obtaining the victim's wallet by threatening to infringe on his intellectual-property rights or to block access to land, and he further argues that "[e]ven physical damage to personal property may be inflicted without force," asserting—again hypothetically—that "[s]omeone could commit a Hobbs Act robbery by threatening in the future to leave the water running in the bathtub of their apartment, causing flooding in the victim's apartment below and ruin of her valuable philatelic collection" or that "[a]nother dastardly fiend could commit a Hobbs Act robbery by threatening to release a box-full of phylloxera upwind of the victim's Sonoma vineyard, thereby devastating the flats of pinot noir vines just arrived from Burgundy, again without the use of any force whatsoever."  [*Id.*].

84

Collins also maintains that the residual clause is unconstitutionally vague, relying upon the Ninth Circuit's decision in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), where the court held, in the context of determining for the purposes of a removal action whether a prior conviction was a "crime of violence," that the residual clause of 18 U.S.C. § 16(b) (which is identical to § 924(c)'s residual clause) was unconstitutional in light of *Johnson*.  [Doc. 46 at 14-17].

### B.     Discussion

Having carefully considered the authority cited by the parties as well as opinions decided even more recently in this rapidly developing area of law, the undersigned concludes that Collins's motion to dismiss is due to be **DENIED**.

As an initial matter, the Court has not been directed to any case, and the Court's independent research has disclosed none, that has found that a substantive Hobbs Act robbery (as opposed to a conspiracy to commit a Hobbs Act robbery[15]) is not a predicate crime for purposes of § 924(c), despite *Johnson*.  On the other hand, every case that has confronted the issue has found contrary to Collins's position.  *See, e.g.,*

---

[15]     *See United States v. Edmondson*, No. PWG-13-15, 2015 WL 9582736, at \*5-6 (D. Md. Dec. 30, 2015).  In *Edmondson*, however, that court expressly distinguished between Hobbs Act conspiracy—which is committed by an agreement alone—and Hobbs Act robbery—which requires actual or threatened force, violence, or fear of injury.  *Id.*

AO 72A
(Rev.8/8
2)

*United States v. Monroe*, — F. Supp. 3d —, Crim. No. 15-74, 2016 WL 270316, at *6 (W.D. Pa. Jan. 21, 2016); *United States v. Tsarneav*, Crim. No. 13-10200-GAO, 2016 WL 184389, at *15-16, 18 (D. Mass. Jan. 15, 2016); *United States v. Walker*, Case No. 3:15cr49, 2016 WL 153088, at *6 (E.D. Va. Jan. 12, 2016); *United States v. Anglin*, No. 14-CR-3, 2015 WL 6828070, at *4-8 (E.D. Wisc. Nov. 6, 2015); *Merinord*, 2015 WL 6457166 at *4-5; *Brownlow*, 2015 WL 6452620 at *4; *Evans*, 2015 WL 6673182 at *6. The Court also finds telling that in order to illustrate his theory that a Hobbs Act robbery could be committed without use, attempted use, or threatened use of physical force against the person or property of another, Collins's very able and experienced counsel has not pointed to a single case where the government has charged a defendant with Hobbs Act robbery that was not alleged to have been committed by means of use, attempted use, or threatened use of physical force. [*See* Docs. 36, 46, *passim*]. Instead he proffers hypothetical fact patterns—threatening biological attack on the victim's vineyard or destruction of property by flood—that are indeed violent, *see United States v. Castleman*, 134 S. Ct. 1405, 1414-15 (2014) (explaining that "the common-law concept of 'force' encompasses even its indirect application" and that "[i]t is impossible to cause . . . injury without applying force in the common-law sense"); *McGuire*, 706 F.3d at 1338

86

("It makes little difference that the physical act, in isolation from the crime, can be done with a minimum of force; we would not say that laying spikes across a roadway is a non-violent crime because laying something upon the ground is not a forceful act.  It still involves an intentional act against another's property that is calculated to cause damage and that is exacerbated by indifference to others' wellbeing."), and hypothetical fact patterns—threatening to infringe on a copyright or cancel an easement—so cartoonishly unlikely to frighten a victim into handing over a wallet or other personal property against his will as to unintentionally prove the point of those courts that have reasoned that a defendant who commits a Hobbs Act robbery by "fear of injury" necessarily commits it by "fear of physical force," *Walker*, 2016 WL 153088 at *5 ("Put simply, common sense dictates that any "fear of injury" flows from the fear of physical force."); *Merinord*, 2015 WL 6457166 at *4 ("A commonsense approach dictates that robbery by fear of injury requires, at a minimum, the attempted or threatened use of force capable of causing physical pain or injury.  . . .  An act or threatened act that engenders fear of injury necessarily implies force causing physical pain or injury") (citing *Castleman*, 134 S. Ct. at 1414-15); *Standberry*, 2015 WL 5920008 at *4 ("Under commonsense analysis, any act or threatened act which engenders a fear of injury implicates force and potential violence."); *see also*

87

*Johnson*, 559 U.S. at 139-40 ("Ultimately, context determines meaning, and we do not force term-of-art-definitions into context where they plainly do not fit and produce nonsense.") (internal quotations and citations omitted).  Thus, there appears to be little basis for a conclusion that Hobbs Act robbery is not categorically a "crime of violence" within the context of 18 U.S.C. § 924(c)(3)(A).

As a second point, the Court notes that the government made an important distinction glossed over by Collins:  this case is in pretrial litigation, yet Collins's theories rely on precedent dealing with retrospective post-trial analysis. [Doc. 43 at 3]. Close reading of Collins's arguments indeed reveals that they presuppose that the retrospective "categorical approach" applies when determining, on a pretrial motion to dismiss, whether an offense may qualify as a "crime of violence" under § 924(c)(3). [*See* Docs. 36, 46, *passim*].  The Court is unconvinced that the categorical approach applies here.

As district courts that have considered the issue have explained in well-reasoned decisions entered over the past several weeks, the judicial construct of the "categorical" or "modified categorical approach" is a "one dimensional analytical construct" that "in the vast majority of cases . . . is used by **sentencing courts** conducting a cold record review of a prior conviction to determine whether its elements square with the

definition of 'crime of violence' articulated in § 924(e)(3), the [ACCA]." *Monroe*, 2016 WL 270316 at *6 (quoting *Standberry*, 2015 WL 5920008 at *2) (internal quotation marks and punctuation omitted).   The courts conducting the sentencing-enhancement analyses are constrained by a combination of Sixth Amendment concerns—to hold the defendant accountable only where the allegation that he had committed a "crime of violence" was properly tried and found beyond a reasonable doubt—and the practicability " 'of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction.' " *Johnson*, 135 S. Ct. at 2562 (quoted in *Standberry*, 2015 WL 5920008 at *2); *see also United States v. McDaniels*, Case No. 1:15-cr-171, 2015 WL 7455539, at *2 (E.D. Va. Nov. 23, 2015) (observing that "the categorical approach is a judicially devised mode of analysis born and developed in the sentencing context for the purpose of ensuring that defendants are not punished for facts that are not found beyond a reasonable doubt by a jury").

Here, in contrast, there is no issue of retrospective analysis.  To prove a violation of 18 U.S.C. § 924(c)(1)(A), the government need not make a determination based on a previous conviction, but instead "must show that the defendant: (1) carried a firearm; (2) committed all the acts necessary to be subject to punishment for a crime of violence;

89

and (3) carried the gun during and in relation to that crime." *United States v. Church*, Case No. 1:15-CR-42-TLS, 2015 WL 7738032, at *6 (N.D. Ind. Dec. 1, 2015) (citing *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003)).   In other words, the commission of a "crime of violence" is an element of the § 924(c) charge.   *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999) (setting out elements of § 924(c)); *Smith v. United States*, 508 U.S. 223, 227-28 (1993) (same); *United States v. Moore*, 43 F.3d 568, 572 (11th Cir. 1994) (as amended Jan. 27, 1995) (same).   There is an indictment presently before the Court that contains exactly such allegations, [Doc. 1, *passim*], and a jury will have an opportunity to determine whether the necessary elements have been established beyond a reasonable doubt in this case.   *See United States v. Lockett*, — F.3d —, No. 14-15084, 2016 WL 240334, at *3 (11th Cir. Jan. 21, 2016) ("The Sixth Amendment contemplates only one way of finding facts: submitting elements to a jury to find beyond a reasonable doubt.") (quoting *Descamps*, 133 S. Ct. at 2288); *McDaniels*, 2015 WL 7455539 at *4 ("[T]he task of assessing whether the facts of the Hobbs Act robbery alleged here fit the definition set forth in § 924(c)(3) belongs to a properly instructed jury.").   Thus, the Sixth Amendment issues implicated in analyzing prior convictions simply are not at issue here, and it inappropriate to apply *Johnson*'s backward-looking categorical approach to a pretrial

90

motion to dismiss a § 924(c) charge before the jury gets to decide whether the underlying Hobbs Act robbery constituted a "crime of violence." *See Monroe*, 2016 WL 270316 at *6; *Church*, 2015 WL 7738032 at *6; *McDaniels*, 2015 WL 7455539 at *4; *Standberry*, 2015 WL 5920008 at *1-2; *see also Tsarneav*, 2016 WL 184389 at *13 n.21 (explaining structural difficulties in applying ACCA § 924(e) analysis to § 924(c) analysis, since the former seeks to mandate a sentencing enhancement in the event of a particular criminal history, while the latter necessarily, an element of the offense charged, focuses on the specific "case" charged in the indictment).  The Court concludes that is the correct analysis.

The Court, however, understands Collins to argue that under any circumstances, in light of *Johnson*, a Hobbs Act robbery is not a "crime of violence" for purposes of § 924(c), [*see* Doc. 36, *passim*], and there is at least some Eleventh Circuit precedent that gives the Court some pause.  For instance, it has not escaped the Court's notice that the Eleventh Circuit, per Justice O'Connor, applied the retrospective categorical approach in *McGuire*, 706 F.3d at 1336 ("McGuire also maintains that, even if he did attempt to damage, destroy, disable, or wreck an aircraft, that is not a crime of violence within the ambit of 18 U.S.C. § 924(c)"), albeit looking backward to a challenge to the sufficiency of the evidence on the § 924(c) conviction where the judge instructed the

91

jury to presume that the predicate offense was a "crime of violence" rather than instructing the jury to find whether the government had indeed proven the predicate "crime of violence," *id*. at 1335-36.  The Eleventh Circuit also recently applied the retrospective categorical approach in *United States v. Keelan*, 786 F.3d 865, 870-71 (11th Cir. 2015), to determine whether 18 U.S.C. § 2422(b) is a "crime of violence" as defined in 18 U.S.C. § 16(b) for the purposes of a post-conviction restitution hearing, again, looking backward, as the jury had been charged not with determining whether the defendant had committed a "crime of violence" but rather simply whether the defendant had "persuaded, induced, or enticed [the victim] to engage in sexual activity," *id*. at 869 n.2.  Accordingly, the Court will also conduct the constitutional analysis.

Under the presumption that the constitutional analysis is necessary, the Court must determine as a question of law whether a Hobbs Act robbery is a "crime of violence" pursuant to § 924(c) " 'categorically'—that is, by reference to the elements of the offense, and not the actual facts of [the defendant's] conduct." *McGuire*, 706 F.3d at 1336 (citing *United States v. Llanos-Agostadero*, 486 F.3d 1194, 1196 (11th Cir. 2007), *overruled on other grounds by Curtis Johnson* (considering whether certain previous convictions were "crimes of violence" for the purpose of sentencing

enhancements)); *see also Brownlow*, 2015 WL 6452620 at *2. The Court "employ[s] this categorical approach because of the statute's terms: It asks whether [the defendant] committed 'an offense' that 'has as an *element* the use, attempted use, or threatened use of physical force against the person or property of another," or that "by its nature, involves a substantial risk that physical force against the person or property of another may be used.' " *McGuire*, 706 F.3d at 1336-37 (quoting 18 U.S.C. § 924(c)(3)(A)-(B)) (emphasis in *McGuire*).

In determining whether a crime is a "crime of violence," the Supreme Court has instructed that where the charging statute is "divisible," *i.e.*, where the statute "sets out one or more elements of the offense in the alternative," courts may look to certain documents, including the indictment, to determine which alternative forms the basis of the charge against the defendant. *Descamps*, 133 S. Ct. 2281. Pursuant to § 1951(a), a Hobbs Act violation may be pleaded with reference to six alternative crimes, among them, "robbery," as defined in § 1951(b), "extortion," as defined in § 1951(c), *or* "commit[ing] or threat[ening] physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a); *see also Brownlow*, 2015 WL 6452620 at *3; *Mackie*, 2015 WL 5732554 at *3. Indeed, not even Collins argues that § 1951(a) is indivisible.

93

[*See* Docs. 36, 46, *passim*].  Accordingly, the Court concludes that § 1951 is a divisible crime.

Since § 1951 is a divisible crime, the Court can apply the so-called "modified categorical approach" and consult the indictment to determine which alternative forms the basis of the Hobbs Act violations charged in this case.  *Descamps*, 133 S. Ct. at 2281; *Shepard*, 544 U.S. at 26.  In this regard, each Hobbs Act count in the indictment provides that Collins "did unlawfully obstruct, delay, and affect commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951, in that" Collins "did unlawfully take and obtain personal property . . . from [the named victim (identified by initials)], who was responding to an ad placed by [Collins] on Craigslist, a website involved in and affecting interstate commerce, *against [the victim's] will by means of actual and threatened force, violence, and fear of injury, immediate and future, to [the victim's] person* [. . .],[16] in violation of Title 18, United States Code, Section 1951." [Doc. 1 at 1-5 (emphasis added)].  Comparing the charges to § 1951(a), it is clear that the indictment alleges that Collins committed the Hobbs Act violation of

---

[16]     Counts Three and Five also alleged a second victim.

"commit[ing] or threaten[ing] physical violence to [a] person or property in furtherance of a plan or purpose" to commit Hobbes Act robbery.

"[C]ommit[ing] or threat[ening] physical violence to any person or property" *per se* meets § 924(c)(3)(A)'s definition of "crime of violence" as an offense that "has as an element the use . . . or threatened use of physical force against the person or property of another." *Compare* 18 U.S.C. § 1951(a) *with* 18 U.S.C. § 924(c)(3)(A). Thus, although Collins urges the Court to dig into § 1951(b) to determine whether the Hobbes Act charges are for "crimes of violence," reference to § 1951(a) is all that is necessary to determine that the charges here do indeed satisfy § 924(c)(3)(A)'s "force" clause.[17]  Consequently, the undersigned concludes that even if application of the

---

[17]     Despite Collins's citation to *United States v. Estrella*, 758 F.3d 1239, 1246 (11th Cir. 2014), the undersigned is skeptical of Collins's argument that the Eleventh Circuit's Pattern Jury Instructions list various means by which Hobbs Act robbery could be committed, as opposed to alternative elements, and that, as a consequence, § 1951(b) is not further divisible.  [*See* Doc. 46 at 10].  The Court reads *Descamps* to indicate that the distinction does not matter.  *See Descamps*, 133 S. Ct. at 2285 n.2 ("Whatever a statute lists (whether elements or means), the documents we approved in *Taylor* [*v. United States*, 495 U.S. 575 (1990),] and *Shepard*—i.e., indictment, jury instructions, plea colloquy, and plea agreement—would reflect the crime's elements. . . . When a . . . law is drafted in the alternative, the court merely resorts to the approved documents and compares the elements revealed there to those of the generic offense.").  Moreover, "[t]he Pattern Instructions act only as a guide for judges when fashioning a jury charge.  They do not constitute precedent and 'cannot foreclose the construction of the necessary elements of a crime as stated in the statute.' " *United States v. Gutierrez*, 745 F.3d 463, 471 (11th Cir. 2014) (quoting *United States v.*

95

modified categorical approach were necessary in this case—which it is not—it would result in a determination that the elements of the Hobbs Act violations charged here are "crimes of violence," and Collins's motion to dismiss based on contrary arguments therefore should be denied.

For all of these reasons, the undersigned **RECOMMENDS** to the District Judge that he **DENY** Collins's motion to dismiss Counts 2, 4, 6, 8, and 10 of the indictment.[18]

## V.    *Conclusion*

In conclusion, the undersigned **RECOMMENDS** that the District Judge **DENY** the motion to suppress as to Defendant's person and the hotel room, [Doc. 18]; **GRANT IN PART AND DENY IN PART** the motion to suppress as to his residence, [Doc. 19]; **DENY** the motion to suppress out-of-court identifications, [Doc. 20]; and **DENY** the motion to dismiss, [Doc. 36].

---

*Ettinger*, 344 F.3d 1149, 1158 (11th Cir. 2003)).

[18]    Because the Court concludes that the constitutional analysis is not implicated upon a pretrial motion to dismiss and alternatively, that even if the constitutional analysis did apply, it appears that Hobbs Act robbery is a "crime of violence" under both the categorical approach and the modified categorical approach, the undersigned need not—and does not—reach the issue of the constitutionality of § 924(c)(3)(B)'s "residual" clause.

AO 72A
(Rev.8/8
2)

The undersigned has now ruled on all referred pretrial matters, and has not been advised of any obstacles to the setting of a trial date.   Accordingly, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 9th day of February, 2016.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

97